[No. B154273. Second Dist., Div. One. Feb. 28, 2003.]

TIMOTHY BRIAN ADAMS, Plaintiff and Appellant, v.
EXPLORER INSURANCE COMPANY, Defendant and Respondent.

## COUNSEL

Bleau, Fox & Associates, Thomas P. Bleau and Gennady L. Lebedev for Plaintiff and Appellant.

Selman • Breitman, Alan B. Yuter and Meka Moore for Defendant and Respondent.

## OPINION

**SPENCER, P. J.—**

### INTRODUCTION

In this case, which involves a dispute regarding the effectiveness of a notice of cancellation of an automobile insurance policy due to nonpayment of premiums, plaintiff Timothy Brian Adams appeals from the summary judgment entered in favor of defendant Explorer Insurance Company. We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

Explorer Insurance Company (Explorer) issued plaintiff a new personal automobile insurance policy, No. EBU165202700, with an effective date of

---

[1]We have augmented the appellate record to include the superior court file.

December 27, 1998. The declarations page of the policy reveals that the policy was issued for a period of one year. At its inception, the policy listed three vehicles, a 1992 Chevrolet Camaro, a 1988 Chevrolet Blazer and a 1998 Chevrolet Suburban, to which the coverage afforded by the policy applied. The policy provided coverage for bodily injury, property damage and uninsured motorist bodily injury. It also provided comprehensive and collision coverage.

Plaintiff's policy premium was to be paid in nine monthly installments. A billing notice dated January 4, 1999 showed that plaintiff's first monthly installment was due on January 26, 1999. Plaintiff routinely was late in making his payments.

On May 11, 1999, plaintiff's 1992 Camaro was stolen. Plaintiff reported the loss to Explorer.

By July 6, 1999, Explorer had not received plaintiff's June installment. On that day, Explorer issued plaintiff a notice of cancellation. The notice listed the reason for cancellation as nonpayment of premiums and specified the amount due as $288.08. The cancellation was to be effective July 19, 1999 at 12:01 a.m. The notice also contained an offer to "reinstate your policy, without any lapse in coverage, if the amount shown above is mailed to the Explorer Insurance Company and post marked prior to 07/19/99. . . ." Explorer mailed this notice of cancellation to plaintiff on July 7. Plaintiff did not recall seeing the notice of cancellation.

South Coast Auto Insurance Mktg. (South Coast) is an authorized insurance broker and agent for Explorer. On July 13, 1999, plaintiff, through South Coast, submitted an "Endorsement Request" asking Explorer to add to policy No. EBU165202700 a 1997 GMC C1500 and a 1999 Chevrolet Suburban and to delete plaintiff's 1998 Chevrolet Suburban and 1992 Chevrolet Camaro. Above the signature line of the Endorsement Request, the following printed statement appears: "I, the undersigned acknowledge and agree that if for any reason my policy is not active, the above endorsement is null and void. In addition, the endorsement being done is subject to acceptance by insurance company(ies) in accordance with their underwriting guidelines." Directly under this printed statement, plaintiff wrote, "I have read and understand the above." His signature followed.

The Endorsement Request form indicates that the endorsement was "[t]elebound" on July 13, 1999, at 11:25 p.m. A payment due date of July 27, 1999 also was listed.

Johnny Kafieh (Kafieh) was the South Coast sales representative who helped plaintiff with his endorsement request. Kafieh telephoned an Explorer

"telebind phone number . . . to get a binder number." Kafieh was unable to "zap[]" the Endorsement Request through the computer. According to Kafieh, "[e]ndorsement requests are not zapable." They have to be processed manually. Only new business is "zapable" from South Coast to Explorer via the computer. During his meeting with Kafieh, plaintiff paid South Coast $252. Kafieh could not recall if he told plaintiff that his $252 payment was for an excess policy rather than his Endorsement Request. Kafieh normally would not have given such an explanation.

On July 15, 1999, Explorer sent plaintiff a "Premium Recap" setting forth a summary of his payments. Plaintiff's total premium was listed as $2,415.39 with an explanation that "[y]our policy change resulted in a premium adjustment of $-442.00 which is included in the 'Total Premium' amount shown." The document further noted that plaintiff had paid premiums totaling $1,729.08 and that his unpaid balance was $686.31. The $442 adjustment resulted from the deletion of plaintiff's stolen Camaro.

An amended declarations page effective June 22, 1999, listed plaintiff's 1988 Chevrolet Blazer and 1998 Chevrolet Suburban as the insured vehicles. The amended declaration therefore reflected the deletion of plaintiff's stolen Camaro.

As of July 19, 1999, Explorer had not received plaintiff's delinquent payment. In a "Cancellation Memo" dated July 20, 1999, Explorer advised plaintiff that his automobile insurance policy had been cancelled effective July 19, 1999. The memorandum contained a reinstatement offer that provided, "Subject to company approval, we may reinstate your policy *with a lapse in coverage* if payment of $186.67 is received by 08/04/99." (Italics added.) The $186.67 listed as due on the cancellation memorandum was $101.41 less than the $288.08 reflected as due on the July 6 notice of cancellation. This difference represented a manual adjustment of the premium. Stated otherwise, it was a credit for a premium payment plaintiff had made for the Camaro before Explorer declared it a total loss.

On August 1, 1999, an Explorer underwriting assistant received plaintiff's July 13, 1999 Endorsement Request. Learning that plaintiff's policy had been cancelled, the assistant did not process the request. Rather, she made a notation that the changes would have to be processed at a later time if the policy subsequently was reinstated.

In ascertaining the premium amount due, plaintiff always relied on what his mail said. Explorer did not receive a payment from plaintiff by the August 4, 1999 deadline specified in the July 20 cancellation memorandum. Plaintiff therefore remained uninsured.

On August 12, 1999, plaintiff was involved in an automobile accident with an uninsured motorist. He was driving his 1997 GMC at the time. Plaintiff sustained property damage and personal injuries as a result of the accident.

On August 13, 1999, one day after plaintiff's accident and well after the August 4 deadline for reinstating plaintiff's policy with a lapse in coverage, Explorer received plaintiff's premium payment via money order in the amount of $186.67. Plaintiff's payment arrived in an envelope postmarked August 12, 1999. A postage meter date of August 2, 1999, which had been imprinted with the postage meter at plaintiff's workplace, also appeared on the envelope. The money order itself bore the handwritten date "8-2-99."

On August 17, 1999, Explorer generated a "Reinstatement Notice," thanking plaintiff for resuming his automobile insurance coverage and reinstating his policy. Explorer reinstated plaintiff's policy effective August 13, 1999, in accordance with its custom and practice of reinstating coverage one day after the postmark date on the envelope containing the payment required for reinstatement. A declarations page generated upon reinstatement continued to list plaintiff's 1988 Chevrolet Blazer and 1998 Chevrolet Suburban as the insured vehicles. It did not reflect the changes made to the policy by virtue of plaintiff's July 13, 1999 Endorsement Request, in that the Endorsement Request was not processed by Explorer until August 30, 1999.

After his accident, plaintiff submitted an insurance claim to Explorer under the uninsured motorist provisions of his policy. Explorer denied the claim. Inasmuch as plaintiff's accident occurred after July 19, 1999, when his policy lapsed due to nonpayment of premium, and before August 13, when it was reinstated, Explorer concluded there was no coverage for the accident.

On August 30, 1999, Explorer finally processed plaintiff's July 13 Endorsement Request. Plaintiff's 1997 GMC and his 1999 Suburban had been effectively insured, however, from July 13, 1999 until the policy was cancelled for nonpayment of premium on July 19.

Following the denial of his insurance claim, plaintiff filed this action seeking compensatory and punitive damages against Explorer. In a first amended complaint filed on May 12, 2000, plaintiff alleged against Explorer causes of action for breach of contract, breach of the covenant of good faith

and fair dealing, fraud, and unfair business practices.[2] Explorer subsequently filed a motion for summary judgment against plaintiff. The trial court granted the motion on July 25, 2001, ruling as follows: "When plaintiff added and deleted two vehicles on July 13, 1999, such constituted an endorsement to his existing policy, regardless that the transmittal used the word 'telebound'. Plaintiff obviously did not rely on the alleged comments of the agent, as he ultimately sent in $186 as a late premium. The fact that plaintiff cannot recall receiving the notice of cancellation does not create a triable issue of material fact. [Citation.]" Thereafter, judgment in favor of Explorer and against plaintiff was entered. This appeal followed.

## CONTENTIONS

Plaintiff contends triable issues of material fact exist with regard to whether Explorer's July 6, 1999 notice of cancellation was effective and whether a new notice of cancellation should have been issued before coverage for the 1997 GMC could be cancelled.

Plaintiff also contends that Explorer failed to meet its burden of proving that the "new" coverage for the 1997 GMC was cancelled effectively after it was issued.

There is no merit to these contentions. The undisputed evidence discloses that plaintiff had no automobile insurance on the day of his accident. The trial court therefore properly granted Explorer's motion for summary judgment.

## DISCUSSION

### Standard of Review

We review the trial court's ruling on a summary judgment motion de novo. (*Leko v. Cornerstone Bldg. Inspection Service* (2001) 86 Cal.App.4th 1109, 1114 [103 Cal.Rptr.2d 858].) Summary judgment properly is granted if there is no question of fact and the issues raised by the pleadings may be decided as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24

[2]Plaintiff also sued South Coast for breach of contract, fraud, negligent procurement of insurance and unfair trade practices. South Coast, in turn, filed a cross-complaint against Explorer for equitable contribution, total implied indemnity and declaratory relief. Plaintiff and South Coast subsequently entered into a settlement agreement, which was confirmed by the trial court. Later, South Coast dismissed its cross-complaint against Explorer without prejudice, and plaintiff dismissed its first amended complaint against South Coast with prejudice. South Coast is not a party to this appeal.

P.3d 493].) To secure summary judgment, a moving defendant may show that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (*o*)(2); *Aguilar, supra,* at p. 849.) Once the moving defendant has met its burden, the burden shifts to the plaintiff to show that a triable issue of fact exists as to the cause of action or the defense thereto. (Code Civ. Proc., § 437c, subd. (*o*)(2); *Aguilar, supra,* at p. 849.) On appeal, this court exercises its independent judgment in determining whether there are no triable issues of material fact and the moving party thus is entitled to judgment as a matter of law. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334-335 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

*Explorer's Notice of Cancellation Was Effective*

Insurance Code section 661, subdivision (a), in pertinent part provides that "[a] notice of cancellation of a policy shall be effective only if it is based on one or more of the following reasons: [¶] (1) Nonpayment of premium." Section 661 does not apply "to any policy or coverage that has been in effect less than 60 days at the time notice of cancellation is mailed or delivered by the insurer unless it is a renewal policy." (*Id.,* subd. (b).) To be effective, a notice of cancellation issued pursuant to section 661 for nonpayment of premiums must be mailed to the named insured at least 10 days prior to the effective date of the cancellation. (*Id.,* § 662.)

Insurance Code section 668.5 provides that "[n]o cancellation of a policy or coverage of insurance subject to this chapter *but not subject to Section 661 or 662 (because it has been in effect less than 60 days)* shall be effective unless a notice of cancellation subject to Sections 664 and 665, when applicable, but not to any other provision of this chapter, be mailed or delivered by the insurer to the named insured not later than the 59th day following its effective date and at least 10 days prior to the effective date of cancellation." (Italics added.)

■ Plaintiff argues that Explorer's notice of cancellation could not cancel the "coverage" for his 1997 GMC effectively, in that this vehicle was not added to the policy until July 13, after the notice of cancellation was issued. Stated otherwise, plaintiff argues that his July 13, 1999 endorsement effectively added new coverage for his 1997 GMC and 1999 Suburban and that a new notice of cancellation was required to terminate that specific coverage. Plaintiff's argument rests upon the faulty premise that his July 13 endorsement added new coverage to his policy. It clearly did not.

As used in Insurance Code sections 661, 662 and 668.5, the term " '[p]olicy' means an automobile liability, automobile physical damage, or automobile collision policy, or any combination thereof, delivered or issued for delivery in this state, insuring a single individual or individuals residing in the same household, as named insured, and under which the insured vehicles therein designated" are of a particular type.[3] (Ins. Code, § 660, subd. (a).) The term "coverage" as it is used in sections 661 and 668.5 refers to the specific types of coverage delineated in section 660. " 'Automobile liability coverage' includes only coverage of bodily injury and property damage liability, medical payments, and uninsured motorists coverage." (*Id.*, subd. (b).) " 'Automobile physical damage coverage' includes all coverage of loss or damage to an automobile insured under the policy except loss or damage resulting from collision or upset." (*Id.*, subd. (c).) " 'Automobile collision coverage' includes all coverage of loss or damage to an automobile insured under the policy resulting from collision or upset." (*Id.*, subd. (d).) The term " '[c]ancellation' means termination of coverage by an insurer (other than termination at the request of the insured) during a policy period." (*Id.*, subd. (g).)

In this case, the undisputed evidence discloses that Explorer issued plaintiff a new one-year automobile insurance policy effective December 27, 1998. From its inception, this policy provided coverage for bodily injury, property damage and uninsured motorist bodily injury. It also provided comprehensive and collision coverage. Plaintiff's endorsement did not broaden the type of coverage afforded under the policy. It effected only a change in the vehicles to which coverage in existence since the inception of the policy applied.

As of July 6, 1999, plaintiff had failed to pay his June premium installment. On that date, Explorer generated a notice of cancellation, specifying nonpayment of premiums as the basis for cancellation. Explorer mailed the notice of cancellation to plaintiff on the next day, July 7. Since plaintiff's automobile insurance policy and the particular types of coverage afforded thereunder had been in effect for more than 60 days when Explorer issued its notice of cancellation due to nonpayment of premiums, Insurance Code sections 661 and 662, not section 668.5, govern the validity of Explorer's notice of cancellation. Moreover, inasmuch as the effective date of the

---

[3]The insured vehicles must be "(1) A motor vehicle of the private passenger or station wagon type that is not used as a public or livery conveyance for passengers, nor rented to others; or [¶] (2) Any other four-wheel motor vehicle with a load capacity of 1,500 pounds or less; provided, however, that this chapter shall not apply (i) to any policy issued under an assigned risk plan, or (ii) to any policy insuring more than four automobiles, or (iii) to any policy covering garage, automobile sales agency, repair shop, service station, or public parking place operation hazards; or [¶] (3) A motorcycle." (Ins. Code, § 660, subd. (a).)

cancellation was listed as July 19, 1999, the notice of cancellation due to nonpayment of premiums mailed 12 days earlier was mailed timely and therefore effective under section 662.

Accordingly, plaintiff's July 13, 1999 endorsement did not affect the validity or effectiveness of Explorer's previous notice of cancellation, and a new postendorsement notice of cancellation was not required. Plaintiff cites no legal authority for the proposition that a change made to the policy after the insurer issued the notice of cancellation but before the cancellation becomes effective, which only adds to the policy new vehicles to which existing coverage applies, invalidates an otherwise valid notice of cancellation, advising the insured that the insurer will cancel his or her policy of insurance due to nonpayment of premiums unless the insured makes payment by a specific date. That plaintiff could not recall receiving the notice does not raise a material factual issue as to the validity and effectiveness of the notice of cancellation that Explorer sent to plaintiff in a timely fashion.

Plaintiff also asserts the notice of cancellation is ineffective for other reasons. Plaintiff does not dispute that he was delinquent in paying his premiums when the notice of cancellation was sent. He argues, however, that he owed $186.67 rather than the $288.08 reflected in the notice of cancellation. ■ He maintains that since the amount due on the notice of cancellation was incorrect, the notice was ineffective. Plaintiff cites no California statutory authority or case law for this proposition, and we are aware of none. Out-of-state authorities are instructive, however.

In *McMillan v. Farm Bureau Mut. Auto. Ins. Co.* (1953) 282 A.D. 1091 [126 N.Y.S.2d 436], the insured argued that a notice of cancellation due to nonpayment of premiums was ineffective because it stated the entire premium was due when only half the premium was due. The court rejected this argument, stating, "The notice of cancellation was effective, even though the amount which it specified, as the amount to be paid to nullify the cancellation, was in excess of the amount then due, under the alleged oral agreement between the plaintiff and the defendant's agent. The plaintiff was not misled by the notice. He knew that the period covered by his initial payment had expired and that a further payment of premium would be required to avoid a cancellation of the policy. If the plaintiff desired to stand upon his claim of an oral agreement requiring him to pay only $40.30 on March 23rd, he should have advised the company of that claim and should have tendered payment accordingly. The plaintiff not having paid or offered to pay any additional premium in any amount, the notice of cancellation remained in effect." (126 N.Y.S.2d at pp. 437-438.)

In *Gannon v. New York Mut. Underwriters* (1981) 78 A.D.2d 399 [435 N.Y.S.2d 163], the insureds received notice that their fire insurance policy

soon would be cancelled due to nonpayment of premiums. The insureds took no action, and their policy was cancelled. A fire thereafter destroyed their home. The insurance company denied their claim due to lack of coverage. The insureds filed suit, claiming that the notice of cancellation had been defective because it failed to set forth the amount of the premium due. (435 N.Y.S.2d at p. 164.) The court rejected this argument stating, "We find nothing in the language of the statute itself, nor in the prior legislative history of the enactment, which offers any support for the proposition that notices of cancellation must state the amount of premium due. The statute lists six reasons for cancellation, one of which is 'nonpayment of premium,' [citation] and the notice herein fully complied with its provisions." (*Id.* at p. 165.)

We agree with the reasoning of these New York cases. Neither Insurance Code section 661 nor section 662 requires an insurance company to set forth in its notice of cancellation for nonpayment of premiums the amount of the arrearage. Inasmuch as an insurer need not state the amount of the arrearage, it follows that if the insurer does so, an error in the amount listed does not render the notice of cancellation ineffective.

■ Plaintiff argues that his July 13, 1999 Endorsement Request indicated that the next payment due date was July 27, 1999. He also emphasizes that no one explained how the $252 payment he made to Kafieh on July 13 would be applied. In addition, Kafieh told him that he had insurance, was covered and everything was fine. None of these facts could retroactively invalidate the notice of cancellation that comported in all respects with the Insurance Code, however.

If there was any confusion engendered by the events transpiring after Explorer issued its notice of cancellation, it was incumbent upon and only reasonable for plaintiff to make the proper inquiry. Plaintiff does not dispute that he was delinquent in his premium payments. He also was well aware that his insurance would be cancelled if he did not make his required payments. In addition, he does not maintain that any of the events occurring after the notice of cancellation was issued led him to believe he was not in arrears or that the conditions prompting issuance of the notice of cancellation had been eliminated such that his policy was in good standing. More fundamentally, nowhere in his opposition to Explorer's motion for summary judgment does plaintiff present evidence establishing that he relied upon any documents generated by Explorer or anything Kafieh said or did to conclude that he was no longer delinquent and that his $252 payment averted the cancellation of his policy. In fact, plaintiff's own deposition testimony reveals that he could not recall receiving the cancellation notice.

Moreover, contrary to plaintiff's characterization, the "Premium Recap" generated by Explorer on July 15 did not state that plaintiff had a $442 credit. It disclosed only that as a result of a policy change, his annual premium had been adjusted downward by $442. The Premium Recap in no uncertain terms stated that plaintiff continued to have an unpaid balance of $686.31.

The bottom line is that plaintiff did not pay his premiums in a timely manner. Explorer warned him in advance that his policy would be cancelled unless he paid a specified amount by a specified date. Plaintiff did not heed this warning. His omission resulted in the cancellation of his policy on July 19, 1999. The very next day, Explorer prepared a cancellation memorandum, which it sent to plaintiff. The memorandum informed plaintiff that his insurance had been cancelled but could be reinstated with a lapse of coverage if he paid an amount, which had been adjusted downward due to the removal of his Camaro from the policy. Plaintiff's reinstatement payment had to be received by Explorer by August 4, however. Plaintiff did not meet this deadline. His reinstatement payment reached Explorer on August 13, 1999—24 days after Explorer prepared the cancellation memorandum, nine days after the reinstatement deadline, and one day after his automobile accident. On August 12, 1999, the date of his accident, plaintiff had no automobile insurance.[4]

*Endorsement to Existing Policy v. Binder of New Insurance*

Next, plaintiff argues that coverage for his 1997 GMC was never effectively cancelled after it was issued. This argument rests upon the faulty premise that his July 13, 1999 Endorsement Request when "telebound" became a binder of new insurance. It did not.

"Endorsements are modifications to the basic insuring forms in the policy. Endorsements may alter or vary any term or condition of the policy." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶ 3:188, p. 3-50.) Some changes are relatively minor. Other endorsements "can add or delete 'additional insureds' and additional 'insured locations' to those listed on the declarations page, substantially changing the risks and premiums." (*Ibid.*) Endorsements may be attached to a policy at its inception or added during the term of the policy. (*Id.,* ¶ 3:191, p. 3-50.)

---

[4]Contrary to his assertion, public policy does not favor plaintiff in this case. *Lee v. Industrial Indemnity Co.* (1986) 177 Cal.App.3d 921 [223 Cal.Rptr. 254], *National Auto. & Casualty Ins. Co. v. California Casualty Ins. Co.* (1983) 139 Cal.App.3d 336 [188 Cal.Rptr. 670], and *Kotlar v. Hartford Fire Ins. Co.* (2000) 83 Cal.App.4th 1116 [100 Cal.Rptr.2d 246], on which plaintiff relies in support of his public policy argument, are inapposite.

Thus, an endorsement is an amendment to or modification of an existing policy of insurance. It is not a separate contract of insurance. Standing alone, an endorsement means nothing. "Endorsements on an insurance policy form a part of the insurance contract [citation], and the policy of insurance with the endorsements and riders thereon must be construed together as a whole [citation]." (*Narver v. California State Life Ins. Co.* (1930) 211 Cal. 176, 181 [294 P. 393, 71 A.L.R. 1374].) "Conditions stated in the policy as such apply to the endorsement." (*Ohio Farmers Indem. Co. v. Interinsurance Exchange* (1968) 266 Cal.App.2d 772, 777 [72 Cal.Rptr. 269].)

■ A binder, on the other hand, is a "temporary contract of insurance." (*Spott Electrical Co. v. Industrial Indem. Co.* (1973) 30 Cal.App.3d 797, 805 [106 Cal.Rptr. 710].) More specifically, it is "a writing . . . which temporarily obligates the insurer to provide . . . insurance coverage pending issuance of the insurance policy. . . ." (Ins. Code, § 382.5, subd. (a).[5]) A binder remains in force for at least 30 days unless it is cancelled, rejected or surrendered earlier. (*Id.*, § 481.1.) Whether undisputed facts establish the existence of a binder is a question of law. (*Granco Steel, Inc. v. Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 191, 197 [65 Cal.Rptr. 287, 436 P.2d 287]; *Spott Electrical Co., supra*, at p. 805.)

A binder is separate and distinct from a permanent policy, however. As noted in *Ahern v. Dillenback* (1991) 1 Cal.App.4th 36 [1 Cal.Rptr.2d 339], "a binder is an independent contract, separate and distinct from the permanent insurance policy. It is intended to give temporary protection pending the investigation of the risk by the insurer and until issuance of a formal policy or rejection of the insurance application by the insurer. Hence, the fact that the effective date of insurance coverage may predate issuance of the policy under a written binder [citation] does not mean the insurance policy has been issued. Rather, a binder evidences that the policy has not yet been issued since the binder is effective until one of two events: the insurance application is rejected or the policy is issued." (At p. 48, fn. omitted.)

■ Plaintiff argues that his July 13, 1999 Endorsement Request contained all the information needed for an effective binder. His efforts to

---

[5]Insurance Code section 382.5, subdivision (a), provides: "A binder which is issued in accordance with this section shall be deemed an insurance policy for the purpose of proving that the insured has the insurance coverage specified in the binder. [¶] (a) As used in this section, 'binder' means a writing (1) which includes the name and address of the insured and any additional named insureds, mortgagees, or lienholders, a description of the property insured, if applicable, a description of the nature and amount of coverage and any special exclusions not contained in a standard policy, the identity of the insurer and the agent executing the binder, the effective date of coverage, the binder number or the policy number where applicable to a policy extension, and (2) which temporarily obligates the insurer to provide that insurance coverage pending issuance of the insurance policy. . . ."

characterize his endorsement request as a request for a new policy are unavailing, however. The Endorsement Request expressly references plaintiff's existing automobile insurance policy, No. EBU165202700. The one-year policy, as originally issued effective December 27, 1998, covered three vehicles: plaintiff's 1992 Camaro, 1988 Blazer and 1998 Suburban. In his Endorsement Request, plaintiff simply asked Explorer to modify his existing policy by deleting his 1998 Suburban and 1992 Camaro and by adding a 1997 GMC and a 1999 Suburban. Coverage as to plaintiff's 1988 Blazer remained unaffected by the Endorsement Request. The endorsement was effective immediately. It became part of the main policy and was subject to the same conditions and limitations of the main policy, including those provisions pertaining to cancellation of insurance.

By signing the endorsement, plaintiff acknowledged that if the policy was not active, the endorsement would be null and void. Plaintiff thus understood that the viability of any endorsement was dependent upon the viability of the underlying policy. Accordingly, when the underlying policy was cancelled, plaintiff's coverage for his 1988 Blazer and for those he added via the endorsement, including the 1997 GMC he was driving at the time of his accident, ended.

Plaintiff further asserts that the broker's notation that the endorsement was "[t]elebound" rendered the endorsement a binder or separate agreement. Plaintiff's own evidence submitted in opposition to Explorer's summary judgment motion renders this conclusion untenable, however. In his deposition testimony, Kafieh, the South Coast sales agent who processed plaintiff's Endorsement Request, explained that he telephoned an Explorer "telebind phone number . . . to get a binder number." Kafieh was unable to "zap[]" the Endorsement Request through the computer, in that such requests had to be handled manually. Only new business was "zapable" from South Coast to Explorer via the computer. Thus, Kafieh himself recognized that plaintiff's Endorsement Request was not a request for new business. That the Endorsement Request was "telebound" only meant that the endorsement or modification to the existing policy took effect immediately. Once the policy lapsed, however, any endorsement to the policy lapsed along with it.

In summary, plaintiff's automobile accident occurred after his policy lapsed due to nonpayment of premiums and before his policy was reinstated. Accordingly, he was uninsured on the date of his accident. The trial court therefore properly granted Explorer's motion for summary judgment.

The judgment is affirmed.

Ortega, J., and Mallano, J., concurred.