Filed 12/4/18; Certified for Publication 1/3/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LUXOR CABS, INC., et al.,<br><br>   Plaintiffs and Respondents,<br><br>v.<br><br>APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE CO. et al.,<br><br>   Defendants and Appellants. | A147962<br><br>(San Francisco City & County Super. Ct. No. CGC 15-548928) |

   In this case involving the provision of workers' compensation insurance to Luxor Cabs, Inc. and Luxor Executive Car Service, LLC (Luxor), appellants Applied Underwriters Captive Risk Assurance Company, Inc. (AUCRA), California Insurance Company (CIC), and certain other affiliated entities[1] challenge the denial of AUCRA's motion to compel arbitration pursuant to the terms of a reinsurance participation agreement (RPA) between Luxor and AUCRA. In particular, appellants argue that the trial court erred both in determining the issue of arbitrability—given the existence of a valid delegation clause—and in subsequently concluding that both the delegation clause and the arbitration provision of which it is a part are unenforceable. The EquityComp workers' compensation insurance program at issue in this case has garnered nationwide attention from numerous administrative agencies and judicial tribunals. (See, e.g.,

---

[1] These additional appellants include Applied Risk Services, Inc. (ARS), Applied Risk Services of New York, Inc., and California Indemnity Company.

*Minnieland Private Day School, Inc. v. Applied Underwriters Captive Risk Assurance Co.* (4th Cir. 2017) 867 F.3d 449 [challenge to EquityComp program under Virginia insurance laws]; *South Jersey Sanitation Co. v. Applied Underwriters Captive Risk Assurance Co.* (3d Cir. 2016) 840 F.3d 138 [challenge under Nebraska insurance laws to use of EquityComp program in New Jersey]; Vermont Dept. of Financial Regulation (Oct. 30, 2015, No. 15-026-I) Stipulation and Consent Order at p. 6 [concluding that, through use of an RPA in a similar program, AUCRA and its affiliates "de facto engaged in the sale of an unfiled, unapproved insurance product in Vermont"].)  In this state, the California Insurance Commissioner (Insurance Commissioner) issued an extensive 2016 administrative decision concluding that the EquityComp program violated state insurance laws and that the RPA between AUCRA and the insured employer in that case was void as a matter of law.  (*Matter of Shasta Linen Supply, Inc.*, Decision & Order (June 22, 2016) file No. AHB-WCA-14-31 (*Shasta Linen*).)[2]  Even more recently, the Fourth Appellate District came to a similar decision in *Nielsen Contracting, Inc. v. Applied Underwriters, Inc.* (2018) 22 Cal.App.5th 1096 (*Nielsen*)—a case essentially identical to this one involving arbitrability under an RPA.  Following these persuasive prior decisions, we affirm.

## I.  BACKGROUND

In 2012, Luxor engaged defendant Heffernan Insurance Brokers (Heffernan) to provide it with workers' compensation insurance quotes.  One of the options Heffernan

---

[2] We hereby grant Luxor's September 2016 request for judicial notice of the *Shasta Linen* decision and related orders and court filings, all of which were issued or filed after the trial court rendered its decision in this matter.  (Evid. Code, §§ 452, subds. (a), (c), & (d), 459, subd. (a).)  The Insurance Commissioner has designated the *Shasta Linen* decision precedential pursuant to section 11425.60, subdivision (b), of the Government Code.  (*Shasta Linen*, *supra*, at p. 70.) In August 2016, as a result of *Shasta Linen*, CIC and AUCRA entered into a stipulated consent cease and desist order with the Insurance Commissioner, agreeing, among other things, to "cease and desist from issuing new RPAs or renewing existing RPAs with respect to a California Policy" unless they are filed with the Insurance Commissioner pursuant to applicable law and not disapproved.  The RPA in *Shasta Linen* is materially identical to the RPA at issue in this appeal.

presented to Luxor was the EquityComp program from Applied Underwriters, Inc. (Applied). In the "Workers' Compensation Program Proposal & Rate Quotation," Applied—an indirect subsidiary of Berkshire Hathaway, Inc.—described EquityComp as a "*seamlessly integrated package* providing nationwide workers' compensation coverage and sophisticated risk financing solutions." (Italics added.) Luxor decided to participate in the EquityComp program and thus, in July 2012, executed a "Request to Bind Coverages & Services" with Applied (Request to Bind) pursuant to which Applied agreed to "cause to be issued" a workers' compensation insurance policy, subject to Luxor executing the RPA. In accordance with the Request to Bind, a one-year guaranteed cost workers' compensation insurance policy (collectively with all renewals, the Policy) was issued to Luxor by CIC, a wholly owned subsidiary of North American Casualty Company, which is in turn wholly owned by Applied. "Under a guaranteed cost policy, the insured company pays a fixed annual premium for the policy term, regardless of subsequent loss experience." (*Shasta Linen*, *supra*, at p. 12.) The CIC Policy was based on forms and rates that had been filed with California's rating organization—the Workers' Compensation Insurance Rating Bureau (WCIRB)—and approved by the Insurance Commissioner as required by California Law, including section 11658 of the Insurance Code.[3] According to the Insurance Commissioner, "[a] great majority of California employers receive workers' compensation insurance coverage through guaranteed cost policies." (*Shasta Linen*, *supra*, at p. 12.)

However, as stated above, as a condition for the issuance of the Policy by CIC, Luxor was also required to enter into the RPA with AUCRA, another wholly owned subsidiary of Applied. The RPA had a three-year term and set forth different calculations for "[p]remium and [l]oss [a]mounts" applicable to "all payroll, premium, and losses occurring under the [CIC Policy]." It also applied distinct early cancellation terms should Luxor cancel the RPA or should the Policy be cancelled or not renewed during the RPA's three-year term. And, it required Luxor to make certain capital deposits into a

_____

[3] All statutory references are to the Insurance Code unless otherwise specified.

3

"segregated protective cell" maintained by AUCRA for payment of potential profits and losses in connection with the Policy. In addition, the RPA included an arbitration provision mandating resolution of "any dispute . . . arising out of or related to this Agreement" through binding arbitration in the British Virgin Islands and under the provisions of the American Arbitration Association. In particular, the arbitration agreement provided that "[a]ll disputes between the parties relating in any way to (1) the execution and delivery, construction or enforceability of this [RPA], (2) the management or operations of [AUCRA], or (3) any other breach or claimed breach of this [RPA] or the transactions contemplated herein" were subject to mandatory binding arbitration. Finally, the RPA contained a choice of law provision stating: "This Agreement shall be exclusively governed by and construed in accordance with the laws of Nebraska and any matter concerning this Agreement that is not subject to the dispute resolution provisions . . . hereof shall be resolved exclusively by the courts of Nebraska without reference to its conflict of laws."

In November 2015—unhappy with both the handling of its workers' compensation claims and the ever-increasing premiums it was paying under the EquityComp program, and unable to obtain a satisfactory explanation from AUCRA—Luxor and Haight Street Garage, Inc. (Haight Street) filed a complaint in San Francisco Superior Court against appellants and Heffernan (Complaint) asserting, among other things, breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and unfair business practices. The Complaint also sought a declaratory judgment stating that the RPA and its arbitration provision were void as violative of California workers' compensation insurance laws. AUCRA responded in December 2015 by issuing a demand for arbitration against Luxor in accordance with the terms of the RPA.[4] Luxor then filed a motion in the instant action specifically

---

[4] The parties agree that Haight Street is not a party to the RPA or required to arbitrate.

4

challenging the RPA's arbitration clause, and AUCRA filed a motion to compel arbitration and otherwise stay court proceedings with respect to the Complaint.

After hearing, the trial court issued a March 2016 order granting Luxor's motion to declare the RPA's arbitration clause unenforceable and, on that basis, denying AUCRA's motion to compel arbitration. In particular, the trial court declined to determine whether the Federal Arbitration Act (9 U.S.C. § 1 et seq.; FAA) was reverse preempted by the McCarran-Ferguson Act (15 U.S.C. §§ 1011–1015; McCarran-Ferguson) in this context; found that—as required by the FAA and related precedent—Luxor had made a specific challenge to the delegation clause in the RPA, thereby allowing the trial court to determine the issue of arbitrability; and concluded that both the delegation clause and related arbitration provision were void because they constituted endorsements to the CIC Policy that had not been appropriately filed and approved by the Insurance Commissioner as required by section 11658. Appellants' timely notice of appeal now brings the matter before this court.

## II. DISCUSSION

### A. *Standard of Review*

Recently, the *Nielsen* court aptly summarized our standard of review in the context of a motion to compel arbitration as follows: "In ruling on a motion to compel arbitration, the trial court shall order parties to arbitrate 'if it determines that an agreement to arbitrate the controversy exists . . . .' [Citation.] '[T]he party seeking arbitration bears the burden of proving the existence of an arbitration agreement by a preponderance of the evidence, and the party opposing arbitration bears the burden of proving by a preponderance of the evidence any defense . . . .' [Citation.] In evaluating an order denying a motion to compel arbitration, ' " 'we review the arbitration agreement de novo to determine whether it is legally enforceable, applying general principles of California contract law.' " ' " (*Nielsen*, *supra*, 22 Cal.App.5th at p. 1106.) To the extent the trial court resolved contested facts, we review those determinations for substantial evidence. (*Ibid.*) Finally, should our review of the arbitration provisions here at issue

5

require statutory interpretation, we engage in such analysis independently. (*Robles v. Employment Development Dept.* (2015) 236 Cal.App.4th 530, 546.)

The parties' dispute, however, must also be considered in the context within which it has arisen. Specifically, the California Constitution "expressly declare[s]" that workers' compensation for workplace injury is "the social public policy of this State" and vests the Legislature "with plenary power, unlimited by any provision of this Constitution, to create, and enforce a complete system of workers' compensation, by appropriate legislation . . . ." (Cal. Const., art. XIV, § 4.) This mandate includes making "full provision for adequate insurance coverage against liability to pay or furnish compensation" and "full provision for regulating such insurance coverage *in all its aspects* . . . ." (*Ibid.*, italics added.) In response, the Legislature has created a comprehensive regulatory scheme, requiring California employers to purchase workers' compensation insurance (Lab. Code, § 3700) and dictating the permissible terms for such insurance (§§ 11650 et seq., 11730 et seq.). (See *Am. Zurich Ins. Co. v. Country Villa Serv. Corp.* (C.D.Cal. July 9, 2015, Civ. No. 2:14-cv-03779-RSWL-AS) 2015 U.S.Dist. Lexis 89452 at pp. *30, *36–*37 (*Country Villa*) ["[i]n California, ' "[w]orkers' compensation insurance programs are to be closely scrutinized and are highly regulated" ' "; "employers in California 'have no choice but to secure workers' compensation insurance . . . and, consequently, the entire system is highly regulated' "]) As an example, the Insurance Commissioner is charged with reviewing and approving "all rates and supplementary rate information that are to be used in this state." (§ 11735, subd. (a); see § 11737 [authorizing disapproval of rates under specified circumstances]; § 11750.3 [authorizing the WCIRB to, among other things, collect and tabulate statistics for the purpose of developing rates and formulating rules and regulations for the administration of ratings systems].) Thus, in construing the arbitration provisions here at issue, we are mindful not only of this significant regulatory backdrop, but also of the express public policies underlying California's workers' compensation system.

**B.** *The Trial Court Properly Determined Arbitrability*

As a threshold matter, we must decide whether the trial court properly determined the enforceability of the RPA's arbitration clause, or whether the validity of that clause should, itself, have been referred to arbitration in accordance with the RPA's terms. Under the FAA, "an arbitration provision contained in any contract involved in interstate commerce 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' " (*Matter of Monarch Consulting Inc. v. National Union Fire Insurance Co. of Pittsburgh, PA* (2016) 26 N.Y.3d 659, 665 [47 N.E.3d 463], quoting FAA § 2.) Generally speaking, "when parties have agreed to arbitration, challenges to the validity of the underlying contract, including contract defenses such as fraud in the inducement or illegality, are for the arbitrator to decide." (*Nielsen*, *supra*, 22 Cal.App.5th at p. 1107; see *Prima Paint Corp. v. Flood & Cocklin* (1967) 388 U.S. 395, 402–403.) This is because an arbitration clause is viewed as severable from the main contract and thus enforceable regardless of the ultimate enforceability of the underlying agreement. (*Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440, 443–445.) In contrast, "challenges to the validity of the arbitration clause itself are generally resolved by the court in the first instance." (*Nielsen*, *supra*, at p. 1108; see *Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63, 71 (*Rent-A-Center*) ["[T]hat agreements to arbitrate are severable does not mean that they are unassailable. If a party challenges the validity under § 2 [of the FAA] of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4 [of the FAA]."].) "An exception to this rule applies when the parties have clearly and unmistakably agreed to delegate questions regarding the validity of the arbitration clause to the arbitrator." (*Nielsen*, at p. 1108.) These so-called "delegation clauses" are generally enforceable according to their terms, requiring the issue of arbitrability to be submitted to the arbitrator for decision. (*Ibid.*)

In *Rent-A-Center*, however, the United States Supreme Court explained the specific circumstances under which the enforceability of a delegation clause should be determined by the courts rather than through arbitration. Characterizing a delegation

7

clause as simply "an agreement to arbitrate threshold issues concerning the arbitration agreement," the high court made clear that "the FAA operates on this additional arbitration agreement just as it does on any other. The additional agreement is valid under § 2 [of the FAA] 'save upon such grounds as exist at law or in equity for the revocation of any contract.' " (*Rent-A-Center*, *supra*, 561 U.S. at pp. 68–70.) Thus, like an arbitration provision generally, a delegation clause nested in an arbitration provision is severable from the remainder of the contract and the question of its enforceability is for the court to decide *if* a challenge is directed specifically at the validity of the delegation clause. (*Id.* at pp. 71–72; see *Nielsen*, *supra*, 22 Cal.App.5th at p. 1108.) In *Rent-A-Center*, the plaintiff opposing arbitration challenged only the validity of the arbitration contract as a whole in the district court—"[n]owhere . . . did he even mention the delegation provision" and none of his substantive unconscionability challenges were "specific to the delegation provision." (*Id.* at pp. 72–74.) Under such circumstances, it was for the arbitrator, not the court, to consider the enforceability of the delegation clause. (*Id.* at pp. 72–76.)

Neither party here suggests that the arbitration provisions of the RPA do not contain a clear delegation clause. And, indeed, the language at issue—making arbitrable "[a]ll disputes between the parties relating in any way to . . . the . . . construction or enforceability of this [RPA]"—is similar to that analyzed by the *Rent-A-Center* court as a delegation clause. (See *Rent-A-Center*, *supra*, 561 U.S. at p. 68.) Nor do appellants dispute the analytical framework established by *Rent-A-Center* for determining the arbitrability of the delegation clause. Rather, they claim that Luxor did not specifically challenge the delegation clause as mandated by *Rent-A-Center*. We disagree.

In its briefing contesting the enforceability of the RPA's arbitration provisions and opposing AUCRA's motion to compel, Luxor specifically challenged the delegation clause on two distinct grounds. First, after asserting that the RPA's arbitration provisions as a whole were unlawful and void, it argued that "under operation of California's insurance law, [AUCRA's] *delegation clause* is just another unfiled and unapproved policy modification that is *independently void* because it too was issued in violation of

8

law." (Italics added.) Luxor also argued that the RPA was governed by Nebraska law, which prohibits arbitration of "any agreement concerning or relating to an insurance policy." (Neb. Rev. Stat., § 25-2602.01(f)(4).) After contending that this Nebraska statute reverse preempts the FAA under McCarren-Ferguson, Luxor concluded that the statute "governs the RPA as an agreement concerning or relating to an insurance policy, and it renders the arbitration agreements within the RPA—*both the arbitration clause and the 'delegation provision'*—void and unenforceable."[5] (Italics added.) During oral argument, Luxor's attorney explained Luxor's specific challenge to the delegation clause, stating: "Under the severability principles of Federal Arbitration Law, you sever out the arbitration agreement and the delegation clause, and you're challenging *each* for being void as against [section] 11658." (Italics added.) Moreover, the trial court clearly recognized Luxor's directed challenge, noting that Luxor's counsel "says there's a challenge not just to the RPA as a whole, there's a challenge to the arbitration provision therein, and to the delegation clause nested within the arbitration provision." And, ultimately, the trial court decided the issue on this basis. Under these circumstances, it is beyond serious dispute that Luxor directed a specific challenge to the delegation clause of the RPA as mandated by *Rent-A-Center*.

Appellants, however, asserts that Luxor's challenge to the delegation clause is not specifically targeted because it is the same claim that Luxor raises with respect to the unenforceability of the arbitration provisions and the RPA as a whole. They claim that a challenge directed at a delegation clause must be "distinct," and thus "[m]aking the same undifferentiated argument as to the RPA, arbitration provision and delegation provision, as Luxor has done here, is not enough." We are not persuaded. Rather, we agree with the *Nielsen* court—which recently considered and rejected this same argument—that

---

[5] As we discuss further below, the trial court did not reach this issue of reverse preemption and enforceability under Nebraska law, because it concluded that the delegation clause was void as violative of section 11658.

9

appellants' position "is not supported by *Rent-A-Center*'s holding or logic." (*Nielsen*, *supra*, 22 Cal.App.5th at p. 1110.)

Indeed, the *Rent-A-Center* court expressly stated that "[i]n some cases the claimed basis of invalidity for the contract as a whole will be much easier to establish *than the same basis* as applied only to the severable agreement to arbitrate." (*Rent-A-Center*, *supra*, 561 U.S. at p. 71, italics added.) And, after concluding that the plaintiff's unconscionability challenge in that case was directed to the agreement as a whole rather than specifically at the delegation clause, the high court speculated: "It may be that had Jackson challenged the delegation provision by arguing that these common [allegedly unconscionable] procedures *as applied* to the delegation provision rendered *that provision* unconscionable, the challenge should have been considered by the court. To make such a claim based on the discovery procedures, Jackson would have had to argue that the limitation upon the number of depositions causes the arbitration of his claim that the Agreement is unenforceable to be unconscionable. That would be, of course, a much more difficult argument to sustain than the argument that the same limitation renders arbitration of his factbound employment-discrimination claim unconscionable. Likewise, the unfairness of the fee-splitting arrangement may be more difficult to establish for the arbitration of enforceability than for arbitration of more complex and fact-related aspects of the alleged employment discrimination." (*Id.* at pp. 72–74.) Thus, *Rent-A-Center*, itself, makes clear "that the focus of the court's attention must be on whether the particular challenge *is directed at* the delegation clause, not whether the same challenges are *also* directed at the agreement or agreements into which the delegation clause is embedded or nested." (*Nielsen*, *supra*, 22 Cal.App.5th at p. 1111.) Moreover, to reject a legitimate contractual challenge to a severed delegation clause merely because similar grounds are suggested as a basis for invalidating the related arbitration provision or entire contract is nonsensical and violates the FAA's mandate that courts "must 'place[] arbitration agreements [such as delegation clauses] on an equal footing with other contracts.' " (*Nielsen*, at p. 1110, quoting *Rent-A-Center*.) Thus, under the facts of this case, the trial court properly determined that it was the proper forum for determining

10

arbitrability under the RPA.[6]  We therefore turn next to the merits of the court's arbitrability decision.

**C.**     ***The Delegation Clause and Arbitration Provision Are Not Enforceable***

The trial court in this case concluded that both the delegation clause and the arbitration provision in the RPA were void and therefore unenforceable because they each separately constituted an "endorsement" to the Policy which was not properly vetted and approved as required by section 11658.  Pursuant to that statute:  "A workers' compensation insurance policy or endorsement *shall not be issued* by an insurer to any person in this state unless the insurer files a copy of the form or endorsement with the rating organization pursuant to subdivision (e) of Section 11750.3 and 30 days have expired from the date the form or endorsement is received by the commissioner from the rating organization without notice from the commissioner, unless the commissioner gives written approval of the form or endorsement prior to that time."[7]  (§ 11658, subd. (a), italics added.)  If the Insurance Commissioner rejects a filed policy or endorsement "it is *unlawful* for the insurer to issue any policy or endorsement in that form."  (*Id.*, subd. (b), italics added.)

"An endorsement is an amendment to or modification of an existing policy of insurance."  (*Adams v. Explorer Ins. Co.* (2003) 107 Cal.App.4th 438, 451.)  It "may be

---

[6] Appellants' citation to *Grove Lumber & Bldg. Supply v. Argonaut Ins. Co.* (C.D.Cal. July 7, 2008, SA CV 07-1396 AHS(RNBx)) 2008 U.S.Dist. Lexis 51752 (*Grove Lumber*) does not change our analysis.  In that case, arbitrability was a question for the arbitration panel in the first instance because the plaintiff had only challenged the enforceability of the agreement as a whole.  (*Id.* at p. *16.)  The court's statement cited by appellants—that section 11658 "does not address the topic of arbitration or provide a procedural framework for resolution of disputes" (*Grove Lumber,* at p. *17)—while undoubtedly true, was made in the context of a discussion of potential reverse preemption under McCarren-Ferguson and has no relevance to our analysis of who decides arbitrability.

[7] Pursuant to subdivision (e) of section 11750.3, the rating agency—the WCIRB— is charged with examining "policies, daily reports, endorsements or other evidences of insurance for the purpose of ascertaining whether they comply with the provisions of law and to make reasonable rules governing their submission."

attached to a policy at its inception or added during the term of the policy." (*Id*. at p. 450.) Further, and particularly relevant for our purposes, endorsements " 'may alter or vary *any* term or condition of the policy.' " (*Ibid.,* italics added; see *Country Villa*, *supra*, 2008 U.S.Dist. Lexis 89452 at p. *32 ["an endorsement, which must be filed, is not limited to provisions addressing the insurer's indemnity obligations, but may be any agreement that alters or adds to any term or condition of an insurance policy"].) In a related vein, at all times relevant to this dispute, California Code of Regulations, title 10 (Regulations), section 2268 provided: "No collateral agreements modifying the obligation of either the insured or the insurer shall be made unless attached to and made part of the policy . . . ."[8] Finally, the CIC Policy, itself, provides: "[T]his policy, including all endorsements forming a part thereof, constitutes the entire contract of insurance. *No* condition, provision, *agreement*, or understanding *not set forth in this policy* or such endorsements *shall affect such contract, or any rights, duties, or privileges arising therefrom*." (Italics added.) Under these circumstances, the RPA's delegation clause constitutes a collateral agreement that should have been endorsed to the CIC Policy after appropriate regulatory review if it alters or adds to the dispute resolution provisions of the CIC Policy. We conclude that it does.

With respect to dispute resolution, the CIC Policy provides: "If you are aggrieved by our decision adopting a change in classification assignment that results in increased

---

[8] Although not applicable to this dispute, Regulations section 2268 was amended in 2016 to reference "ancillary agreements" rather than "collateral agreements." (*Nielsen*, *supra,* 22 Cal.App.5th at p. 1114.) In its current form, Regulations section 2268 provides that an insurer shall not use any policy form, endorsement form, or ancillary agreement unless it is "attached to and made a part of the policy" and "filed and approved by" the Insurance Commissioner. Moreover, ancillary agreement is defined by Regulations 2250, subdivision (f), as meaning "an agreement that is a supplementary writing or contract relating to a policy or endorsement form that adds to, subtracts from, or revises the obligations of either the insured or the insurer regarding any terms of an insurance policy including, but not limited to, dispute resolution agreements, policy premium amounts or rates, expense or tax reimbursement or allocation, deductible amounts, policy duration, cancellation, or claims administration."

12

premium, or by the application of our rating system to your worker's compensation insurance, you may dispute these matters with us. . . . If you are dissatisfied . . . you may appeal to the insurance commissioner." Such an appeal is to be made pursuant to sections 11737 and 11753.1. Other than this right to administrative review under specified circumstances, the CIC Policy is silent as to the resolution of disputes, leaving intact all of the insured standard rights to judicial review.

In contrast, as stated above, the RPA's delegation clause makes arbitrable "[a]ll disputes between the parties relating in any way to . . . the . . . construction or enforceability of this [RPA]." The stated purpose of the RPA is to allow Luxor to "share in the underwriting results" of the CIC Policy. To this end, the RPA, among other things, contains early cancellation terms triggered by the cancellation or nonrenewal of the Policy; appoints ARS—another subsidiary of Applied—as the billing agent for both AUCRA and CIC, stating that Luxor, AUCRA, and CIC authorize ARS "to account for offset and true up any and all amounts due each of the parties"; and authorizes AUCRA to "take all reasonable steps to protect its and its affiliates' " interests upon any default by Luxor under the RPA *or any affiliated agreements* (italics added). Finally, the RPA states that it "supersedes all prior . . . understandings *relating to the subject matter hereof.*" (Italics added.) On these facts, it is clear that the RPA alters or adds to the dispute resolution provisions of the CIC Policy in that a dispute could arise pursuant to the Policy that would trigger a demand for arbitration under the terms of the RPA. Indeed, that is exactly what happened in this case: Luxor's Complaint—alleging mishandling of claims, irregularities in the computation of its payment obligations, and excessive charges upon CIC's unilateral nonrenewal of the Policy—was subjected to AUCRA's motion to compel. Moreover, supplanting the Policy's dispute resolution provisions was clearly the intent behind the EquityComp program, as the Request to Bind required Luxor to agree that "any claims, disputes, and/or controversies" involving *the RPA or the Policy* would be resolved through alternative dispute resolution.

In *Shasta Linen*, the Insurance Commissioner found that the RPA between Shasta Linen and AUCRA was a "collateral agreement" within the meaning of

13

Regulations former section 2268 because it modified and supplanted the terms of the CIC policies and therefore it should have been filed with, and approved by, the Insurance Department before it became effective. (*Shasta Linen*, *supra*, at pp. 1, 46, 53, 58.) The Insurance Commissioner further found that "the RPA's arbitration clause was intended to 'supplant [the dispute resolution provisions] of the [CIC] guaranteed cost policy' and the arbitration clause substantially modified these CIC provisions." (*Nielsen*, *supra,* 22 Cal.App.5th at p. 1115, quoting *Shasta Linen*, *supra*, at p. 56.) Moreover, according to the Insurance Commissioner, "Regulations former section 2268 was 'clear on its face' that 'unendorsed side agreements are prohibited' and an 'arbitration obligation' comes within the definition of a 'side agreement[]' that must be filed before it is effective." (*Neilsen,* at pp. 1115–1116, quoting *Shasta Linen*, at p. 43.) Finding this analysis persuasive, the *Nielsen* court concluded that both the delegation clause and arbitration provision of the RPA in that case were required to be filed with the Insurance Commissioner because both "were collateral side agreements that materially modified the earlier approved CIC policies." (*Id.* at p. 1116.) As described above, our own analysis of the RPA and related documentation presented for our review confirms these prior decisions. In sum, since the delegation clause clearly purports to alter Luxor's access to both administrative and judicial review under the CIC Policy, it, in its own right, is a collateral agreement that should have been filed and endorsed to the Policy.[9]

The case is even stronger when the impact of the entire arbitration provision on the CIC Policy is considered. Pursuant to other clauses in the RPA's arbitration provision,

---

[9] In this regard, it is worthy of note that, although the RPA was not executed until July 3, 2012, both the CIC Policy and the RPA became effective as of June 30, 2012, one day before section 11658.5 became applicable in this state. (See § 11658.5, subd. (e) [making section 11658.5 applicable to all workers' compensation policies issued or renewed on or after July 1, 2012].) That statute requires disclosure of dispute resolution provisions and an opportunity to negotiate them in connection with any written quote for the provision of workers' compensation coverage. (*Id.*, subd. (a).) Failure to comply with the statute's requirements results in default to California as the choice of law and forum for resolution of California-based disputes. (*Id.*, subd. (c).)

14

all arbitration proceedings are required to take place in the British Virgin Islands and are subject to enforcement under Nebraska law. Further, arbitrability is extended to all disputes involving the "management or operations of AUCRA" and "any other breach or claimed breach of this [RPA] *or the transactions contemplated herein*." (Italics added.) When taken as a whole, then, the RPA's arbitration provision purports to effect even more changes to the dispute resolution provisions in the underlying CIC policy than did the contract's separate delegation clause. Under these circumstances, we conclude—as did the court in *Nielsen*—that the arbitration provision is also a collateral agreement under section 11658 and Regulations former section 2268 that should have been filed and endorsed to the Policy.[10] (*Nielsen*, *supra,* 22 Cal.App.5th at pp. 1113–1117.)

Appellants, however, argue that the RPA, with its attendant arbitration provisions, cannot be viewed as an endorsement modifying the CIC Policy because it was executed by AUCRA not CIC, and thus does not affect the rights or obligations of either CIC or Luxor under the CIC Policy. Rather, AUCRA claims the RPA was a separate arrangement between Luxor and AUCRA which permitted Luxor to share in both the risks and profits associated with its claims history under the Policy. This argument has been rejected both by the Insurance Commissioner in *Shasta Linen* and by the *Nielsen* court. Specifically, the Insurance Commissioner opined that "the 'affiliated entities' (Applied, AUCRA, and CIC) were 'so enmeshed' and 'intertwined' that they should be considered together in determining whether the RPA constitutes a modification of the CIC policies." (*Nielsen*, *supra,* 22 Cal.App.5th at pp. 1113–1117, quoting *Shasta Linen*.)

---

[10] Again, reference to *Grove Lumber* does not help appellants. In that case, the insured conceded that the side agreement at issue was neither an insurance policy nor an endorsement, and the court found section 11658 inapplicable on that basis. (*Grove Lumber*, *supra*, 2008 U.S.Dist. Lexis 51752 at pp. *18–*19.) To the extent the district court suggested in dicta that endorsements are limited to matters involving an insurer's " 'indemnity obligations for loss or liability' " we disagree with it, as has a subsequent district court judge who directly considered the matter and the Insurance Commissioner. (See *County Villa*, *supra*, 2015 U.S.Dist. Lexis 89452 at pp. *28–*33; *Shasta Linen*, *supra*, at pp. 54–55.)

15

The *Nielsen* court determined that its own record on appeal supported the Insurance Commissioner's findings (*id.* at pp. 1116–1117), and we reach the same conclusion based on the evidence before us.

As stated above, the Workers' Compensation Program Proposal & Rate Quotation, submitted for Luxor's consideration by Applied, described EquityComp as a "*seamlessly integrated package* providing nationwide workers' compensation coverage and sophisticated risk financing solutions." (Italics added.) Indeed, the Request to Bind executed by Luxor required Luxor to execute the RPA in order for Applied to "cause to be issued" the CIC Policy. Moreover, as we have discussed in connection with the RPA's dispute resolution provisions specifically, the RPA clearly attempts to supplant the basic, approved provisions of the CIC Policy in numerous respects. Indeed, the Insurance Commissioner concluded that an RPA, in effect, essentially converts a guaranteed-cost policy into a loss-sensitive, retrospective rating plan that returns risk to employer-insureds without any regulatory oversight. (*Shasta Linen*, *supra*, at pp. 15–16, 22–24, 55–58, 60–62.) In the end, we find most compelling the adverse implications of reaching the opposite conclusion on these facts. Obviously, allowing an insurer to circumvent the comprehensive regulatory structure applicable to the issuance of workers' compensation insurance in this state simply by amending its approved policy forms through a side agreement with a subsidiary is contrary to the public policy underlying California's workers' compensation law and cannot be countenanced. (See *Shasta Linen*, *supra*, at p. 61 [concluding that the purpose of the EquityComp program was "to circumvent the necessary regulatory checks-and-balances needed in a comprehensive state workers' compensation system to protect insurers, employers, and injured workers and assure financial accountability, fairness, and non-discriminatory treatment of insureds"].) We thus view EquityComp as a single, integrated insurance program, despite the fact that the Policy was issued by CIC and the RPA executed by AUCRA.

We similarly reject appellants' argument that, even if the delegation clause and arbitration provision at issue constitute collateral agreements that should have been filed under section 11658, this does not make them void as the trial court held, because the

16

statute does not specifically provide for this remedy. Appellants' initial assertion in this regard—that "California's workers' compensation regime does not provide a private right of action for employers seeking relief for non-compliance with Section 11658"—while perhaps accurate, is misplaced. Luxor is not here suing for damages based on a violation of section 11658; nor is it seeking to compel AUCRA's compliance with that statute. Instead, it is asserting, as a defense to AUCRA's attempt to enforce the RPA, that the contract is illegal and thus unenforceable. The existence of a private right of action is not required under such circumstances. (*Crusader Ins. Co. v. Scottsdale Ins. Co.* (1997) 54 Cal.App.4th 121, 125 [the "use of statutes to establish elements of preexisting common law causes of action presents an issue quite distinct from the issue of whether a regulatory statute creates a wholly new private right to sue"]; see *Kashani v. Tsann Kuen China Enterprise Co.* (2004) 118 Cal.App.4th 531, 552–554.)

Moreover, the trial court's conclusion that the delegation clause and arbitration provision are void, and not merely voidable, is supported both by the language of section 11658 and by relevant precedent. As delineated above, section 11658, subdivision (a), "states that a workers' compensation insurance policy or endorsement '*shall* not be issued by an insurer' unless it is filed with the WCIRB and in one way or another approved by the [Insurance] Commissioner, and [subdivision] (b) states that issuing an unapproved policy or endorsement 'is unlawful.' " (*Country Villa*, *supra*, 2015 U.S.Dist. Lexis 89452 at pp. *44–*45, italics added by *Country Villa*.) On this basis, the federal district court in *Country Villa* concluded that an unfiled and unapproved collateral agreement to a workers' compensation policy was "void as a matter of law." (*Ibid*.; see *Malek v. Blue Cross of California* (2004) 121 Cal.App.4th 44, 70 ["a contract made in violation of a regulatory statute is void"]; *Smith v. Bach* (1920) 183 Cal. 259, 262 ["[a] statute . . . prohibiting the making of contracts, except in a certain manner, *ipso facto* makes them void if made in any other way"].) Both the Insurance Commissioner and the *Nielsen* court persuasively reached the same conclusion with respect to the specific RPA at issue in this case. (*Nielsen*, *supra,* 22 Cal.App.5th at p. 1118; *Shasta Linen*, *supra*, at p. 66 ["[u]nfiled side agreements are prohibited and shall not be used without complying with

17

[regulatory] requirements; otherwise, they are not permitted in this state and are void as a matter of law"].)

As a final matter, we note that in *Citizens of Humanity, LLC v. Applied Underwriters, Inc.* (2017) 17 Cal.App.5th 806, the Second Appellate District recently analyzed a similar EquityComp RPA and concluded that its arbitration provision was unlawful because it violated Nebraska law, which reverse preempted the FAA under the terms of McCarran-Ferguson. (*Citizens of Humanity,* at pp. 809, 816–821.) Like the arbitration provision in this case, the RPA at issue in *Citizens of Humanity* provided that it was to be " 'exclusively governed by and construed in accordance with the laws of Nebraska.' " (*Id.* at p. 810.) As mentioned above, Nebraska law prohibits arbitration of "any agreement concerning or relating to an insurance policy." (Neb. Rev. Stat., § 25-2602.01(f)(4)).) Moreover, under McCarran-Ferguson, "state laws 'regulating the business of insurance' preempt any federal statute not specifically related to the business of insurance and that impairs state insurance laws." (*Citizens of Humanity*, at p. 810, quoting 15 U.S.C. § 1012(b).) Applying the three-part test for determining whether McCarran-Ferguson causes a state law to reverse preempt a federal statute—"(1) whether the federal statute to be preempted specifically relates to the business of insurance, (2) whether the state law was enacted for regulating the business of insurance, and (3) whether application of the federal statute operates to invalidate, impair, or supersede the state law"—the *Citizens of Humanity* court held that the Nebraska statute at issue was enacted for the purpose of regulating the business of insurance and would be invalidated through application of the FAA. (*Citizens of Humanity*, pp. 816–818.) Since the RPA's choice of law provision made the Nebraska statute applicable to the RPA, the state statute reverse preempted the FAA and made the delegation and arbitration provisions in the RPA unenforceable. (*Citizens of Humanity*, at pp. 818–821.) Although, as stated above, the trial court declined to reach this issue, we find *Citizens of Humanity* persuasive, and it provides a distinct, additional basis for upholding the trial courts arbitrability determinations in this case.

18

### III. DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal.

_____
REARDON, J.**


We concur:



_____
STREETER, ACTING P. J.



_____
SMITH, J.*


*Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A147962, *Luxor Cabs, Inc. v. Applied Underwriters Captive Risk Assurance Co.*

Filed 1/3/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LUXOR CABS, INC., et al.,<br><br>        Plaintiffs and Respondents,<br><br>v.<br><br>APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE CO. et al.,<br><br>        Defendants and Appellants. | A147962<br><br>(San Francisco City & County Super. Ct. No. CGC 15-548928)<br>ORDER CERTIFYING OPINION FOR PUBLICATION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

        The requests for publication of this court's December 4, 2018 opinion are granted, and it is hereby ordered that said opinion be published in the Official Reports.

Dated:                                         _____
                                                      Streeter, Acting P.J.

1

Trial Court:                          San Francisco City and County

Trial Judge:                        Hon. Harold E. Kahn

Counsel for Appellants:          DLA Piper LLP (US)
Shand S. Stephens
Erin Frazor

Wilson, Elser, Moskowitz, Edelman & Dicker LLP
John Podesta
Laura E. Fannon

Counsel for Respondents:       Roxborough, Pomerance, Nye & Adreani, LLP
Nicholas P. Roxborough
Joseph C. Gjonola
Ryan R. Salsig

A147962/*Luxor Cabs v. Applied Underwriters Captive Risk Assurance Co.*