Filed 6/27/25; Certified for Publication 7/23/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| RICARDO LARA, as Insurance Commissioner, etc., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CALIFORNIA INSURANCE COMPANY, <br><br> Defendant and Appellant. | A170622 <br><br><br> (San Mateo County Super. Ct. No. 19-CIV-06531) |

Insurance Code section 1011 requires a superior court to appoint the California Insurance Commissioner (commissioner) as the conservator of an insurance company if the insurer, "without first obtaining the consent in writing of the commissioner, . . . has entered into any transaction the effect of which is to merge, consolidate, or reinsure substantially its entire property or business in or with the property or business of any

1

other person." (Ins. Code,[1] § 1011, subd. (c) (section 1011(c)).) California Insurance Company (CIC or CIC I) attempted, without the commissioner's consent, to merge with a newly-formed New Mexico corporation, California Insurance Company II, Inc. (CIC II), to redomesticate in that state. The trial court therefore granted the commissioner's application to be appointed as CIC's conservator. Several years later, the trial court approved and adopted the commissioner's rehabilitation plan that specified the terms for ending the conservatorship.

CIC now appeals, arguing the conservatorship was unlawfully imposed and should have been vacated. CIC also contends the trial court abused its discretion in approving the rehabilitation plan because the plan requires CIC to settle certain litigation against CIC by its policyholders. CIC further objects to a provision in the plan requiring that CIC's California policies be reinsured and assumed by another company, and, if the reinsurer is affiliated with CIC, that the reinsurer use an independent third-party administrator. We find no merit in CIC's arguments and affirm the trial court's order.

## BACKGROUND

CIC provides worker's compensation insurance to businesses. Eighty-five percent of its business is in California.

Most worker's compensation insurance consists of guaranteed cost policies, under which the policyholder pays the same premium rate regardless of the amount of claims ultimately

---

[1] Undesignated statutory citations are to the Insurance Code.

filed under the policy. Another type of policy is a retrospective rating plan, under which the premium a policyholder owes is adjusted after the end of the policy period, within minimum and maximum levels, based on the amount of losses during the policy period. (*The Travelers Indemnity Co. v. Lara* (2022) 84 Cal.App.5th 1119, 1125.) Because the premium changes based on the amount of losses, a retrospective rating plan returns some risk to the policyholder. Only large employers can qualify for retrospective rating plans because smaller employers are presumed to be less sophisticated insurance consumers and less able to predict their future losses.

Retrospective rating plans are issued through an endorsement to a guaranteed cost policy. (See *The Travelers Indemnity Co. v. Lara*, *supra*, 84 Cal.App.5th at p. 1125.) California law prohibits an insurer from issuing a worker's compensation policy or endorsement unless the insurer files a copy of the form or endorsement with a rating organization, the Workers Compensation Insurance Rating Bureau, which in turn passes it on to the commissioner for approval. (§ 11658, subd. (a).)

## I. EquityComp and Ensuing Litigation

In 2011, CIC's president and chief operating officer, Steven Menzies, together with others, patented a "Reinsurance Participation Agreement" (RPA). The RPA was designed to allow an insurer to offer a retrospective rating policy to small and medium-sized companies. The RPA would accomplish this by having an employer take out a guaranteed cost policy, then the

insurer would cede some of the insured risk to a reinsurer, such as a captive reinsurer, together with a portion of the premium. The reinsurer would then enter into a side agreement with the policyholder to cede some of that risk back to the policyholder. At the end of the policy period, the reinsurer would refund some of the premiums to the policyholder if the losses were lower than expected or charge the policyholder more if the losses were higher.

Under a program called EquityComp, CIC followed this template and issued guaranteed cost policies that had been submitted to the rating organization for the commissioner's approval. CIC had its affiliate, Applied Underwriters Captive Reinsurance Assurance Company (AUCRA), reinsure some of the risk and issue the side agreements to the policyholders, which were not submitted for the commissioner's approval. An actuary employed by the California Department of Insurance (department) opined that CIC's rates on the standard form policy were on the order of 33 percent higher than the industry average.

Beginning in 2012, 68 EquityComp policyholders filed various claims or actions challenging the RPA. In a 2016 ruling in one of those challenges, the commissioner found that the RPA constituted a misapplication of CIC's filed rates in violation of section 11737. (*Matter of Shasta Linen Supply, Inc.*, Insurance Commissioner (June 22, 2016) No. AHB-WCA-14-31 (*Shasta Linen*).) The commissioner's *Shasta Linen* decision declared that CIC's failure to file and secure approval of the RPA as required by section 11658 rendered it void as a matter of law.

4

CIC petitioned for review of *Shasta Linen* in Los Angeles Superior Court, and in 2017 the parties settled their dispute. The parties agreed they had a good faith dispute about whether the RPA was void as a matter of law and the remedy authorized by the Insurance Code. A recital to the agreement stated that this dispute was "ultimately for the courts to decide." CIC and the department further agreed that the *Shasta Linen* decision was precedential in administrative proceedings before the department, the department had approved an amended RPA with additional disclosures, CIC would not change the amended RPA without submitting it to the department for review and approval, and CIC would dismiss its writ petition. One paragraph of the settlement agreement declared that nothing in it "limit[ed] the power of the Commissioner to initiate any legal or administrative proceeding, to take any action permitted by law and to seek and obtain all relief and remedies available (including any fine or penalties) or to adjudicate the right of others, as otherwise permitted by law." No employers in California bought any EquityComp policies containing the amended RPA after the settlement.

Litigation on the other RPA claims and actions policyholders had filed against CIC continued in California courts, federal courts, administrative proceedings before the commissioner, and in arbitration. CIC succeeded in defeating class certification motions. (E.g., *National Convention Services, LLC v. Applied Underwriters Capital Risk Assurance Co.* (S.D.N.Y. July 27, 2019, No. 15cv7063) 2019 WL 3409882, at *1;

5

*Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.* (E.D.Cal. Apr. 17, 2019, Nos. 2:16-cv-158-WBS AC, 2:16-cv-1211 WBS AC) 2019 WL 3244487, at *2.) One federal court granted CIC and its affiliates summary judgment on claims that the RPA violated the Unfair Competition Law because it was void. (*Pet Food Express, Ltd. v. AUI* (E.D.Cal. Sept. 12, 2019, No. 2:16-cv-01211 WBS AC) 2019 WL 4318584, at *2, *4.)

In other actions, federal district courts ruled that policyholders were liable for premiums due under CIC's standard form guaranteed cost insurance policies even though the RPA was void or regardless of whether it was void. (E.g., *Applied Underwriters, Inc. v. Top's Personnel, Inc.* (D. Neb. Aug. 2, 2018, No. 8:15-CV-90) 2018 WL 3675242, at *3–*4 [granting summary judgment on premiums due under guaranteed cost policy without deciding whether RPA was void].) Ten administrative decisions by the commissioner likewise declared the RPA to be void and unlawful but affirmed the legality of CIC's guaranteed cost policies. In California courts, this court and two other appellate courts held that CIC's failure to file the RPA or related agreement with the commissioner rendered the arbitration agreement contained within the RPA or related agreement void as a matter of law. (*Jackpot Harvesting, Inc. v. Applied Underwriters, Inc.* (2019) 33 Cal.App.5th 719, 738; *Luxor Cabs, Inc. v. Applied Underwriters Captive Risk Assurance Co.* (2018) 30 Cal.App.5th 970, 976–977 (*Luxor Cabs*); *Nielsen Contracting, Inc. v. Applied Underwriters, Inc.* (2018) 22 Cal.App.5th 1096, 1113–1114 (*Nielsen Contracting*).) Many trial courts before and

6

after these decisions likewise held that the RPA's arbitration provision or the RPA in its entirety was void or invalid. Two arbitrators found the RPA to be valid, one made no ruling on its legality, one did not rule on its legality under section 11658 but found it contained misrepresentations and was unconscionable, one found the RPA should have been filed but that the policyholder did not have a private right of action to enforce that requirement, and seven found the RPA to be invalid in whole or in part. Some of those arbitrators awarded damages to the policyholder. One of those seven, like the federal decisions, issued an award requiring the policyholder to pay premiums due to CIC under the guaranteed cost policy. Many cases have yet to be fully resolved because of a stay in connection with the initiation of the conservatorship at issue here.

## II. Menzies Acquisition and Attempted Merger

As of January 2019, Berkshire Hathaway, Inc. (Berkshire Hathaway) indirectly owned 81 percent of CIC and its affiliates. Berkshire Hathaway agreed that month to sell its shares to Menzies, CIC's president and chief operating officer, who already owned 11.5 percent of the company. The agreement allowed Berkshire Hathaway to retain a $50 million breakup fee if the transaction did not close by September 30, 2019.

As required by section 1215.2, subdivision (a), in April 2019 Menzies submitted an application to the department for approval of the transaction. The application informed the commissioner of the breakup fee and transaction deadline. The commissioner had 60 days to act on the application. (§ 1215.2, subd. (d).) After the

7

commissioner found Menzies' first two applications insufficient and Menzies withdrew them, Menzies submitted a third application on September 7, 2019.

On September 13, 2019, the department sent CIC various follow-up questions, including a question about CIC's total liability in pending litigation. CIC responded that it was defending 50 cases and its total liability was $50 million. CIC at the time had $1.1 billion in assets, $615 million in capital and surplus, and $240 million on deposit with the department. On September 19 and 24, 2019, the department asked follow-up questions on other matters, to which CIC promptly responded. On September 27, 2019, the department informed CIC that it could neither approve nor disapprove CIC's application by September 30 because it had numerous remaining questions about the pending litigation's financial impact on CIC.

Berkshire Hathaway required CIC to pay $10 million for an extension of the transaction deadline until October 10, 2019. Menzies then proposed and the New Mexico Office of the Superintendent of Insurance agreed to hold an expedited approval process to re-domesticate CIC in New Mexico by merging CIC into a newly formed New Mexico corporation, CIC II. On October 9, 2019, a department attorney participated in a confidential meeting of New Mexico, Texas, and California insurance regulators. Later the same day, the New Mexico superintendent of insurance held a hearing on CIC's merger application. Department representatives monitored the hearing by phone. A New Mexico official testified that after the meeting

earlier that day, she was aware of objections from other regulators. The New Mexico superintendent approved the merger, conditioned on the stock transactions between Menzies and Berkshire Hathaway closing by October 10, 2019, and CIC II immediately afterwards filing articles of merger with the New Mexico Secretary of State. The New Mexico order required CIC II to assume liability for all of CIC's issued policies and maintain its $240 million deposit with the department.

In a press release after the hearing, the New Mexico Office of the Superintendent of Insurance announced that during the pre-meeting call the department had failed to articulate any basis for denying the proposed merger under New Mexico law and had said that the proposed merger presented no risks to California policyholders. However, the department representatives said afterwards that they had never made the latter statement. The press release also said that no one in attendance at the hearing offered any objection to the merger. The department representatives later said they did not register an objection during the hearing because the issue in the hearing was whether to approve a transaction under New Mexico law, which was an issue for the New Mexico regulator.

Later on the day of the hearing, Berkshire Hathaway notified the department that, based on the lack of objections at the hearing, it intended to close the sale to Menzies on October 10, 2019. On the same day, the department notified CIC that if the merger was completed without the commissioner's approval, CIC would be in violation of California law. Post-merger, CIC

9

would cease to exist, and CIC II, as an unlicensed insurer, would be precluded from transacting the business of insurance in California until it became admitted.[2]  The department did not respond to Berkshire Hathaway's letter, and its transaction with Menzies closed.

CIC II satisfied the New Mexico superintendent's conditions for approval, so the merger of CIC with CIC II would be completed by filing a certificate of merger with the California Secretary of State.  (Corp. Code, § 1108, subd. (d).)  On October 22, 2019, the department asked CIC by telephone not to file the certificate of merger with the California Secretary of State so that the parties could meet and resolve their issues.  CIC agreed, but the parties never met.

## III.   Conservatorship

On November 4, 2019, without notice to CIC, the commissioner filed an ex parte application to be appointed conservator of CIC.  The application relied on section 1011(c), which requires a court to appoint the commissioner as conservator of an insurance company if the commissioner shows the company has, without the commissioner's consent, transferred or attempted to transfer substantially its entire

---

[2] A company is "admitted" to transact a class of insurance by obtaining a certificate of authority from the commissioner. (§ 700, subd. (a).)  Before issuing a certificate of authority, the commissioner must consider the applicant's qualifications with respect to, among other things, capital and surplus, financial stability, and reinsurance, as well as the "competency, character, and integrity of management" and the "fairness and honesty of methods of doing business."  (§ 717.)

10

business or entered into a transaction to merge. The commissioner alleged CIC violated this provision by attempting to merge with CIC II without the commissioner's approval under section 1215.2, subdivision (a). The commissioner further alleged that providing notice of the application to CIC would have been prejudicial because CIC could have completed the merger by filing the certificate of merger. The trial court issued the requested order the same day.

In January 2020, CIC moved to vacate the conservatorship order, arguing, among other things, that the conservatorship was unnecessary because CIC consented to an injunction against the merger pending the commissioner's approval. In August 2020, the trial court denied CIC's motion. CIC challenged the order by filing a petition for writ of mandate in this court in October 2020, but this court summarily denied CIC's petition. (*Cal. Ins. Co. v. Superior Court* (Nov. 25, 2020, A161049).) CIC II and an affiliate of CIC filed federal actions seeking to vacate the conservatorship and enjoin it. (*Applied Underwriters, Inc. v. Lara* (E.D.Cal. 2021) 530 F.Supp.3d 914; *California Ins. Co. v. Lara* (E.D.Cal. 2021) 547 F.Supp.3d 908.) The district courts dismissed both suits, and the Ninth Circuit Court of Appeals affirmed. (*Applied Underwriters, Inc. v. Lara* (9th Cir. 2022) 37 F.4th 579, 600.)

**IV.  Rehabilitation Plan**

In October 2020, the commissioner filed an application for approval of a rehabilitation plan, which would end the conservatorship. Two aspects of the plan are relevant here.

11

Section 2.2 of the plan would require CIC and AUCRA to enter into an "Assumption Reinsurance and Administration Agreement" to allow an insurer admitted in California to reinsure and assume all of CIC's California policies and liabilities to policyholders. Under this provision of the plan, the commissioner would solicit bids and select the reinsurer. If the commissioner were to select an affiliate of CIC as the reinsurer, that reinsurer would have to hire an independent third-party administrator for claims administration. Upon the effective date of the assumption and reinsurance agreement, the commissioner as CIC's conservator would effectuate the merger of CIC into CIC II, thereby redomesticating CIC in New Mexico, and cancel CIC's certificate of authority to transact business in California.

Section 2.6 concerns the pending litigation against CIC. Section 2.6 incorporated by reference schedule 2.6, which sets out three options under which CIC and AUCRA would offer to settle the litigation against them. Option 1 would allow policyholders to renounce the RPA and obtain restitution of any amounts they paid CIC over the cost of the guaranteed cost policy premiums. Option 2 would allow policyholders to renounce the RPA and obtain restitution of any amounts they paid over the cost of a standard, approved retrospective rating plan at the time of the policy's inception. And option 3 would allow policyholders to ratify the RPA and accept liability under it. CIC's liability to any claimant who did not accept one of the settlement options would pass to the reinsurer under the reinsurance and assumption

agreement, and the conservator would set aside a reserve amount to cover those claims.

CIC opposed the settlement provision in section 2.6 of the plan. It did not object to the reinsurance and assumption provision in section 2.2, so long as its affiliate Continental Indemnity Company (Continental) had the right to match any other company's offer for CIC's California policies and the commissioner dropped the requirement that an affiliate reinsurer use an independent third-party administrator for claims handling.

The trial court approved the plan in April 2024. CIC appealed and also filed a petition for writ of mandate challenging the approval of the plan. This court summarily denied the petition in a one-paragraph order, noting that CIC had failed to demonstrate that its remedy on appeal was inadequate. (*Cal. Ins. Co. v. Superior Court* (June 20, 2024, A170573).)

## DISCUSSION

### I. Appealability

An order approving a rehabilitation plan for an insurer under a conservatorship is appealable under section 904.1, subdivision (a)(1) of the Code of Civil Procedure. (*Quackenbush v. Mission Ins. Co.* (1996) 46 Cal.App.4th 458, 461, fn. 1, citing Code Civ. Proc., 904.1, subd. (a)(1) & *Carpenter v. Pacific Mut. Life Ins. Co.* (1937) 10 Cal.2d 307, 322–323 (*Carpenter*).)

The commissioner disputes this and urges us to treat the appeal as a writ proceeding. He asserts that a conservatorship proceeding under Insurance Code section 1011 is a special

13

proceeding to which section 904.1 of the Code of Civil Procedure does not apply. He points out that section 904.1, subdivision (a)(1) is contained in Part 2 of that code and that the California Supreme Court "long ago held that Part 2 of the Code of Civil Procedure extends generally only to civil 'actions,' and not to 'special proceedings.' " (*Agricultural Labor Relations Bd. v. Tex-Cal Land Management, Inc.* (1987) 43 Cal.3d 696, 707.) That remark, however, concerned the applicability of the appellate stay provision in Code of Civil Procedure section 916 et seq. (*Tex-Cal*, at pp. 706–707.) In the same case, the California Supreme Court also observed that "[i]t has long been established that the statutory right of appeal of final judgments and orders extends even to 'special proceedings [including] those intended to be summary in nature' unless the Legislature has expressly prohibited an appeal in the particular case." (*Id.* at p. 705.) Consistent with this statement is *Carpenter*, *supra*, 10 Cal.2d at pages 322–323, which entertained an appeal from an order approving a rehabilitation plan and held that the appeal encompassed all preliminary orders that preceded it.

The commissioner fears that aggrieved parties in conservation proceedings will assert a right to immediate appeal from different types of rulings, including procedural orders and evidentiary findings, which will create confusion and delay. We do not hold that any conservation-related order is appealable, merely that the rehabilitation plan order that will resolve the

14

conservation is appealable.[3] The commissioner also suggests that the approval of the rehabilitation plan does not determine all of CIC's rights, since the commissioner will still periodically require judicial orders relating to implementation of the plan. But *Carpenter*, *supra*, 10 Cal.2d at page 323, noted that a proceeding for a conservatorship of an insurer lasts "until the proposed plan is ultimately passed upon." In addition, a final judgment is a determination that " ' "terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined." ' " (*Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 304.) The order approving the rehabilitation plan fits this description, since the only thing remaining after that order is the execution of the plan, at the end of which CIC will merge with CIC II and cease to exist as an independent entity. We therefore agree with CIC that the order approving the rehabilitation plan is appealable, and we

---

[3] In particular, interim orders involving the conservator's management of the conserved insurer would likely not be appealable. For example, in this case CIC moved to modify the conservatorship order and to vacate the conservatorship. CIC noted in its petition for writ of mandate challenging those orders that they were not appealable. Similarly, an order allowing discovery, like the one the trial court entered here, or an order approving the commissioner's fixing of expenses of conservatorship, to be paid out of the assets of the conserved insurer (§ 1035, subd. (a)), would likely not be appealable under Code of Civil Procedure section 904.1, subdivision (a)(1). Any challenge to such orders would have to be pursued by writ petition or in an appeal from the order approving the rehabilitation plan or otherwise ending the conservatorship.

15

decline the commissioner's invitation to treat the appeal as a writ proceeding.

## II. Standard of Review

The commissioner placed CIC in conservatorship and proposed the rehabilitation plan pursuant to authority under section 1011(c). "The statutory authority he exercises in that effort is an aspect of the police power of the state. It is substantial in its scope, but not boundless. Its basic parameters were described by our Supreme Court over [85] years ago in *Carpenter v. Pacific Mut. Life Ins. Co.*, *supra*, 10 Cal.2d at page 329: 'The only restriction on the exercise of this power is that the state's action shall be reasonably related to the public interest and shall not be arbitrary or improperly discriminatory.'" (*Commercial Nat. Bank v. Superior Court* (1993) 14 Cal.App.4th 393, 398.) As the parties here both recognize, this has been held to require a trial court to review a commissioner's action "under the abuse of discretion standard [citation]: was the action arbitrary, i.e., unsupported by a rational basis, or is it contrary to specific statute, a breach of the fiduciary duty of the conservator as trustee, or improperly discriminatory?" (*In re Executive Life Ins. Co.* (1995) 32 Cal.App.4th 344, 358.) On appeal, "[w]e also test the action of the trial court by the abuse of discretion standard. [Citation.] In this connection we employ the equivalent of the substantial evidence test by accepting the trial court's resolution of credibility and conflicting substantial evidence, and its choice of possible reasonable inferences." (*Ibid.*)

16

## III.  Analysis

CIC challenges the trial court's imposition of the conservatorship in the first place, its refusal to vacate it, and its approval of the rehabilitation plan that would now end it.  We consider each argument in turn.

### A. Imposition of the conservatorship

CIC contends the conservatorship was unlawfully imposed because there have never been any concerns about CIC's solvency or financial condition.[4]  CIC's argument rests on the interplay of section 1011, which authorizes conservatorships of insurers, and sections 1215.2, 1215.10, 1215.12, and 1215.16, which concern acquisitions or mergers of insurers.  While CIC's argument is not complicated, to follow it one must first understand the operation of the relevant statutes.

Section 1011 states that the "superior court of the county in which the principal office of a person [purporting to do insurance business] is located, upon the filing by the commissioner of the verified application showing any of the conditions in this subdivision exist, . . . shall issue its order vesting title to all of the assets of that person, wheresoever situated, in the commissioner or his or her successor in office, in his or her official capacity, and

---

[4] The commissioner argues in a footnote that CIC cannot argue that a conservation based on an unapproved attempt to merge also requires the threat of insolvency because CIC did not raise that issue below.  We need not respond to arguments raised only in a footnote.  (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 419 ["An appellant cannot bury a substantive legal argument in a footnote and hope to avoid waiver of that argument."].)

17

direct the commissioner . . . to conduct, as conservator, the business of the person." (§ 1011; see § 1010 [conservatorship statutes apply to, among others, all persons "purporting to do insurance business in this state"].)  The list of circumstances supporting a conservatorship includes "[t]hat the person, without first obtaining the consent in writing of the commissioner, has transferred, or attempted to transfer, substantially its entire property or business or, without consent, has entered into any transaction the effect of which is to merge, consolidate, or reinsure substantially its entire property or business in or with the property or business of any other person." (§ 1011(c).)  It also includes the circumstance "[t]hat the person is found, after an examination, to be in a condition that makes its further transaction of business hazardous to its policyholders, or creditors, or to the public." (*Id.*, subd. (d).)  The Legislature enacted section 1011 in 1935, and the wording of these triggering conditions for a conservatorship remains substantively unchanged since then.  (Stats. 1935, ch. 145, § 1011, p. 540.)

In 1969, the Legislature added article 4.7 to division 1, part 2, chapter 2 of the Insurance Code and titled it the "Insurance Holding Company System Regulatory Act."  (Stats. 1969, ch. 1275, § 1, pp. 2487–2488.)  As relevant here, section 1215.2, subdivision (a) states, "A person shall not make a tender offer for, or a request or invitation for tenders of, or enter into an agreement to exchange securities for or acquire in the open market, any voting security, or any security convertible into a voting security, of a domestic insurer or of any other person

18

controlling a domestic insurer, if the other person is not substantially engaged either directly or through its affiliates in any businesses other than that of insurance, if, as a result of the consummation thereof, the person would, directly or indirectly, acquire control of the insurer, and a person shall not enter into an agreement to merge with or otherwise to acquire control of a domestic insurer, unless, at the time copies of the offer, purchase, request, or invitation are first published, sent, or given to security holders or the agreement or transaction is entered into, as the case may be, the person has filed with the commissioner, and has sent to the insurer, a statement containing" certain information. The required disclosures include the backgrounds and identities of everyone on whose behalf the transaction is to be effected; the source of the funds to be used; and any plans or proposals to liquidate the insurer, sell its assets, or merge it. (§ 1215.2, subd. (a)(1)–(5).)

Section 1215.2, subdivision (d) states, "The purchases, exchanges, mergers, or other acquisitions of control referred to in subdivision (a) may not be made until the commissioner approves the purchases, exchanges, mergers, or other acquisitions of control. The commissioner shall approve or disapprove the transaction on or before the latter of 60 days after the statement required by subdivision (a) has been filed with the commissioner or, if a hearing is held pursuant to subdivision (f), 30 days after the close of the hearing held pursuant to subdivision (f)." The statute then lists reasons why the commissioner may disapprove the transaction. (§ 1215.2, subd. (d)(1)–(5).)

Section 1215.10, subdivision (a) allows the commissioner to apply for an injunction when it appears to the commissioner that an insurer "has committed or is about to commit a violation" of the Insurance Holding Company System Regulatory Act. Section 1215.12 states in full, "Whenever it appears to the commissioner that any person has committed a violation of this article which so impairs the financial condition of a domestic insurer as to threaten insolvency or make the further transaction of business by it hazardous to its policyholders, creditors, shareholders, or the public, then the commissioner may proceed as provided in Article 14 (commencing with Section 1010) of Chapter 1 of this part to take possession of the property of the domestic insurer and to conduct the business thereof." Finally, section 1215.16 states in full, "All laws and parts of laws of this state inconsistent with this article are hereby superseded with respect to matters covered by this article."

CIC's argument based on these statutes takes two forms, each of them straightforward. CIC first argues narrowly that the commissioner's conservatorship application alleged violations of section 1215.2 to justify the conservatorship, so the commissioner's failure to identify any financial impairment means his application did not satisfy section 1215.12's requirements for a conservatorship. This is incorrect. The first sentence of the commissioner's application states that the application rests on section 1011. The application later alleges repeatedly that Menzies' attempt to merge CIC with CIC II justified a conservatorship under section 1011. The

20

commissioner unambiguously relied on his authority under section 1011, not section 1215.12.  The application does further allege that the attempted merger without the commissioner's approval also violated section 1215.2.  But these further allegations do not undermine or disclaim the reliance on section 1011, so the commissioner's application properly relied on his authority under that statute.

CIC also argues more broadly that the Legislature limited the reach of section 1011(c) — which CIC terms a historic, general statutory provision — when it enacted what CIC calls the specific, remedial structure for unauthorized mergers in article 4.7.  CIC contends that by specifying in section 1215.12 that the commissioner can impose a conservatorship under section 1011 and related statutes for an unauthorized merger that "so impairs the financial condition of a domestic insurer as to threaten insolvency or make the further transaction of business by it hazardous to its policyholders, creditors, shareholders, or the public" and enacting section 1215.16's supersession provision, the Legislature repealed the broader authorization of conservatorships in section 1011(c) for any unauthorized merger. According to CIC, if an authorized merger does not so impair the financial condition of an insurer that it threatens insolvency or makes the operation of the insurer hazardous, then the commissioner may not impose a conservatorship and may only pursue injunctive relief.

We are not persuaded that the Legislature intended section 1215.16 to expressly repeal section 1011(c), as CIC contends.

21

Most obviously, section 1011 remains in effect; the bill that enacted sections 1215.12 and 1215.16 did not repeal section 1011(c). Section 1215.16's supersession provision is not to the contrary. Section 1215.12 invokes the conservatorship proceedings under section 1010 and following sections, so the Legislature intended those statutes to remain in effect. It would be strange for the Legislature to allow section 1011(c) to remain in force, authorizing a conservatorship whenever an insurer attempts to merge its business without permission, while obliquely limiting it through sections 1215.12 and 1215.16 to authorize a conservatorship only when a merger creates a risk of financial impairment. It would be particularly strange to do so while leaving section 1011, subdivision (d) in effect, which authorizes a conservatorship whenever an insurer is found to be in a hazardous condition. A far more natural method of achieving the purpose that CIC ascribes to the Legislature would have been to add the requirement of financial impairment to section 1011(c), but the Legislature did not do this.

Although CIC protests that section 1215.16 makes this a question of express repeal, in actuality CIC's argument is one of implied repeal. "Repeals by implication are disfavored." (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 637.) " 'Notwithstanding the "presumption against repeals by implication," repeal may be found where (1) "the two acts are so inconsistent that there is no possibility of concurrent operation," or (2) "the later provision gives undebatable evidence of an intent to supersede the earlier" provision.' [Citation.] 'Because "the

doctrine of implied repeal provides that the most recently enacted statute expresses the will of the Legislature" [citation], application of the doctrine is appropriate in those limited situations where it is necessary to effectuate the intent of drafters of the newly enacted statute. " 'In order for the second law to repeal or supersede the first, the former must constitute a revision of the entire subject, so that the court may say that it was intended to be a substitute for the first.' " ' " (*Wishnev v. The Northwestern Mutual Life Ins. Co.* (2019) 8 Cal.5th 199, 211.)

As the commissioner points out, section 1215.12 is easy to harmonize with section 1011(c). The conservatorship statutes, including section 1011, apply to all persons "purporting to do insurance business in this state." (§ 1010.) Section 1011(c) allows for a conservatorship of an insurer based on an attempted merger without requiring a showing of insolvency or financial hazard.

Section 1215.12, meanwhile, applies to a broader group than just insurers, but allows for conservatorships in narrower circumstances. Section 1215.12 allows the commissioner to place an insurer in a conservatorship when it appears to the commissioner that "any person" has violated section 1215.2 or other statutes in a way that impairs the financial condition of an insurer that threatens insolvency or makes the insurer's further operation hazardous. Section 1215.2, subdivision (a), among other things, prohibits a "person" from making a tender offer or requesting or inviting tenders for securities of an insurer or a "person" controlling an insurer, or from "enter[ing] into an

23

agreement to merge with or otherwise to acquire control of a domestic insurer" unless, when the offer, request, or agreement is made, the required information has been filed with the commissioner. Section 1215.2 further provides that such "purchases, exchanges, mergers, or other acquisitions of control" may not be made without the commissioner's approval. (*Id.*, subd. (d).) "Person" is defined for both of these sections to include any individual or other entity. (§ 1215, subd. (m).) Because section 1215.12 applies to non-insurers and prohibits anyone from even offering to buy an insurer without satisfying the statutory requirements, it makes sense that the Legislature would limit conservatorships based on violations of such requirements to those that threaten the solvency or safe operation of the insurer.

The Legislature's limitation of the scope of the remedy for its new requirements applicable to non-insurers does not mean that it also intended to limit the scope of the existing remedy applicable only to insurers. When an insurer violates section 1215.2 by agreeing to merge, as CIC did, it triggers the provision in section 1011(c), even if that agreement did not also trigger section 1215.12 because it did not threaten the insurer's solvency or make its continued operation hazardous. Because sections 1215.2 and 1215.12 are not incompatible with section 1011(c), evince no intent to supersede section 1011(c), and did not revise the entire subject of conservatorships of insurers, but rather added a more limited conservatorship remedy for a broader set of

24

actors, we hold that section 1215.2 and 1215.12 did not expressly or impliedly repeal section 1011(c).

CIC contends that the commissioner has only ever invoked section 1011(c) for insurers in financial distress and cites various cases describing section 1011 conservatorships as the state equivalent of bankruptcy law for insurers.  (E.g., *State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1295 [§ 1011 "is part of . . . article 14," which "relate[s] to the Commissioner's treatment of insolvent insurers" and is the "equivalent of federal bankruptcy laws"]; *Financial Indemnity Co. v. Superior Court of Los Angeles* (1955) 45 Cal.2d 395, 402 ["The primary purpose for the drastic remedy [of conservatorship] . . . is to prevent dissipation of the assets of the company after the commissioner has determined that a hazardous condition exists."].)

We agree that this case appears to be the first decision dealing with a conservatorship involving an insurer not in financial distress.  However, the absence of a precedent directly on point demonstrates only that before CIC, solvent insurers were careful to obtain the necessary approval before placing their business at risk of conservatorship.  While the conservatorship system does replace the bankruptcy system for insurers, who are excluded from federal bankruptcy, that does not mean that only bankrupt or insolvent insurers can be placed under conservatorship.  As our Supreme Court explained long ago in *Carpenter, supra,* 10 Cal.2d at page 329, "It is no longer open to question that the business of insurance is affected with a public interest" because "[i]nsurance is a public asset, a basis of credit,

25

and a vital factor in business activity." *Carpenter* involved an insolvent insurer, but given the role insurance plays in the economy and society, the public's interest in insurers and the insurance industry extends beyond insolvency to ensuring that insurers follow statutes and regulations enacted to protect policyholders and the public.

The plain language of section 1011(c) permits a conservatorship based on an attempted unauthorized merger even when the insurer involved is solvent, and it is not absurd for the Legislature to intend to prohibit insurers from merging without the commissioner's consent, regardless of solvency questions. We therefore follow the statute's plain language. (*People v. Velador* (2024) 103 Cal.App.5th 687, 693 [if statutory language is clear, courts must follow its plain meaning unless it would result in absurd consequences that the Legislature did not intend].)

### B. Maintenance of the conservatorship

CIC argues that even if the commissioner properly placed CIC under conservatorship based only on the attempted merger, the commissioner and the trial court abused their discretion by not vacating the conservatorship on CIC's motion when CIC agreed to an injunction prohibiting it from completing the merger. CIC contends its offer to stipulate to an injunction made the conservatorship unnecessary. It further contends the trial court's refusal to vacate the injunction failed to account for various facts, including that the merger was only necessary to satisfy the Berkshire Hathaway deadline after the commissioner

26

refused to approve or disapprove Menzies' application to acquire CIC due to concerns about the RPA litigation. CIC also asserts that the department appeared at the New Mexico merger hearing and did not object, CIC complied when the commissioner asked it not to file the certificate with the Secretary of State to complete the merger in California, the commissioner failed to raise any concerns about the RPA litigation during its consideration of Menzies' application to acquire CIC until days before the Berkshire Hathaway deadline, and CIC's assets and capital were more than sufficient to address the maximum exposure from the RPA litigation.

We reject CIC's argument for the same reasons that the Ninth Circuit rejected the similar argument that the conservatorship proceeding was brought in bad faith. (*Applied Underwriters, Inc. v. Lara*, *supra*, 37 F.4th 579.) As the Ninth Circuit explained, "the conservatorship action was brought for a legitimate reason — indeed, [CIC's and its affiliates'] own factual allegations make out a violation of § 1215.2(d) sufficient to trigger a conservatorship under § 1011(c). The allegations make clear that [CIC and its affiliates] neither sought nor received approval from the [department] for the proposed purchase of the controlling interest in CIC I and the concomitant CIC I / CIC II merger, as required by California Insurance Code § 1215.2(d), and that the merger was an obvious attempt to avoid the California insurance regulatory regime." (*Id.* at p. 597.) Given that CIC created the RPA with the express intent of bypassing state insurance regulations limiting the marketing of

27

retrospective rating policies, the commissioner determined that the RPA was unlawful and void, and that CIC attempted to merge with an out-of-state entity a matter of days after the commissioner raised concerns about CIC's litigation of suits based on the void RPA, the commissioner could reasonably determine that it was necessary to place CIC under conservatorship to prevent CIC from pursuing any further schemes to dodge or stymie the commissioner's oversight, despite the offer to stipulate to an injunction.

The various facts that CIC cites, even if true, are beside the point. Fundamentally, as the Ninth Circuit recognized, Menzies "made a $50 million bet with Berkshire Hathaway . . . that he could complete the purchase of Berkshire [Hathaway]'s controlling interest in CIC I by September 30, 2019." (*Applied Underwriters, Inc. v. Lara*, *supra*, 37 F.4th at p. 584.) The deadline was not of the commissioner's making. Menzies lost the bet when the commissioner failed to approve the transaction by the deadline Berkshire Hathaway set. The answer, then, was for Menzies to pay his loss by forfeiting the breakup fee (*ibid.*), not for Menzies and CIC to try to seek to complete the transaction anyway by hurriedly redomesticating CIC within less than two weeks by merging with a newly created out-of-state entity without the commissioner's approval. Given CIC's demonstrated willingness to flout the law for its own financial gain, the trial court and by extension the commissioner did not abuse their discretion by concluding that a conservatorship was necessary to

ensure CIC's compliance with the law, rather than acceding to CIC's preferred course of a stipulated injunction.

This case is comparable in this regard to *Caminetti v. Guaranty Union Life Ins. Co.* (1942) 52 Cal.App.2d 330. The commissioner there placed an insurer in conservatorship because the insurer's management was paying itself excessive salaries that placed the insurer in a hazardous condition. (*Id.* at pp. 332–335.) The insurer later argued that the trial court should have terminated the conservatorship because the insurer removed the grounds for the conservatorship by voluntarily reducing the management's salaries. (*Id.* at pp. 335–336.) The Court of Appeal noted that the same management remained in control and found that the trial court or commissioner would only be warranted in returning the company back to the management's control if there was evidence that their state of mind had changed. (*Id.* at p. 336.) The Court of Appeal deferred to the trial court's conclusion, after taking evidence, that the management "should not again be permitted to control the destinies of the policyholders." (*Ibid.*) So, too, here, the court and the commissioner would only have been obligated to terminate the conservatorship if there were evidence that CIC's management had changed its state of mind. We defer to the trial court's view that the stipulation to an injunction was insufficient, given the other evidence of CIC's intentionally evasive behavior.

**C. Rehabilitation plan to end the conservatorship**

CIC's remaining arguments challenge the terms of the commissioner's rehabilitation plan pursuant to which CIC can

exit conservatorship, complete its merger with CIC II, and redomesticate in New Mexico.

A conservatorship under section 1011 "contemplates, not the liquidation of the company involved, but a conservation of the assets and business of the company over the period of stress by the commissioner who thereafter yields the control and direction to the regular officers of the company." (*Caminetti v. Superior Court* (1941) 16 Cal.2d 838, 843.) Section 1012 sets out the terms for ending a conservatorship under section 1011. It states that with one exception not relevant here, a conservatorship order "shall continue in force and effect until, on the application either of the commissioner or of [the insurer under conservatorship], it shall, after a full hearing, appear to the court that the ground for the order directing the commissioner to take title and possession does not exist or has been removed and that the person can properly resume title and possession of its property and the conduct of its business." (§ 1012.) "In order to effect rehabilitation, the Commissioner may enter into a court-approved rehabilitation agreement." (*State of California v. Altus Finance, supra*, 36 Cal.4th at p. 1295; accord, § 1043 ["the commissioner, as conservator or as liquidator, may, subject to the approval of said court, . . . mutualize or reinsure the business of such person, or enter into rehabilitation agreements"]; *Carpenter, supra,* 10 Cal.2d at p. 323 ["when the commissioner files a petition to be appointed conservator and asks authority to work out a rehabilitation plan," the proceeding lasts "until the proposed plan is ultimately passed upon"].)

30

Section 1043 does not delineate the scope of the commissioner's authority to enter into rehabilitation agreements, but that authority is presumed to be limited by the provisions in the other statutes governing the conservatorship proceedings in sections 1010–1062.  (*Commercial Nat. Bank v. Superior Court*, *supra*, 14 Cal.App.4th at p. 410.)  One such statute is section 1037, which lists various powers the commissioner has as the conservator of an insurer.  Section 1037, subdivision (c) (section 1037(c)) states that the commissioner "[s]hall have authority to compound, compromise or in any other manner negotiate settlements of claims against that person upon such terms and conditions as the commissioner shall deem to be most advantageous to the estate of the person being administered or liquidated or otherwise dealt with under this article."

Because CIC sought to merge with an out-of-state entity and redomesticate in New Mexico, sections 1071.5 and 1072 are also relevant here.  Section 1071.5 states, "Every insurer which withdraws as an insurer, or is required to withdraw as an insurer, from this State shall, prior to such withdrawal, discharge its liabilities to residents of this State.  In the case of its policies insuring residents of this State it shall cause the primary liabilities under such policies to be reinsured and assumed by another admitted insurer.  In the case of such policies as are subject to cancellation by the insurer, it may cancel such policies pursuant to the terms thereof in lieu of such reinsurance and assumption."  Section 1072 provides that if the commissioner examines the books and records of a withdrawing insurer and

31

determines that "the insurer has no outstanding liabilities to residents of this State and no policies in favor of the residents of this State uncanceled or the primary liabilities under which have not been reinsured and assumed by another admitted insurer, as required by Section 1071.5, he shall cancel the insurer's certificates of authority, if unexpired, and he shall permit the insurer to withdraw. The commissioner may, in his discretion, waive any or all of the above requirements if, after such examination, he finds it to be in a solvent condition."

### 1. Section 2.6's settlement of the RPA litigation
### a. Relationship to basis for conservatorship

CIC offers multiple reasons why the provision of the rehabilitation plan allowing CIC's policyholders to settle their claims against CIC is legally unauthorized, but none has merit. Most generally, CIC contends the RPA litigation was not the basis for the conservatorship and settlement of the RPA litigation is therefore not necessary to address the reasons for the conservatorship. The commissioner disputes whether section 1012 requires each aspect of a rehabilitation plan to be limited to the original grounds for the conservatorship, pointing out that section 1012 states that a conservatorship ends when the court concludes that the circumstances that gave rise to it no longer exist "*and* that the person can properly resume title and possession of its property and the conduct of its business." (§ 1012, italics added.) But he also maintains that settlement of

32

the RPA litigation is related to the grounds for the conservatorship.

The language of section 1012 is broad, and the second clause is written in the present tense, suggesting that the commissioner can include in a rehabilitation plan provisions aimed at remediating flaws or issues he discovers in the conserved insurer during the course of the conservatorship that are not related to the reason for the conservatorship. But we need not come to a definitive conclusion on this question. Assuming for the sake of argument that CIC is correct and a rehabilitation plan can only address the reasons for a conservatorship, the trial court and the commissioner reasonably concluded that settlement of the RPA litigation does so.[5]

CIC attempted to merge without the commissioner's approval and depart the state because the commissioner refused to approve Menzies' acquisition of CIC. The Ninth Circuit recently concluded as much, noting that Menzies merged CIC with CIC II "to bypass the California insurance regulatory regime altogether" (*Applied Underwriters, Inc. v. Lara*, *supra*, 37 F.4th at pp. 584–585) "and that the merger was an obvious attempt to avoid the California insurance regulatory regime" (*id.* at p. 597). The commissioner refused to approve Menzies' acquisition

---

[5] CIC argues that the trial court's reliance on the second condition in section 1012 for termination of a conservatorship, that the insurer can properly resume title and possession of its business, violates state administrative law and due process. Because we do not rely on this aspect of section 1012 to affirm the trial court's order, we need not examine these arguments.

because of concerns about the RPA litigation.  If the commissioner had not placed CIC in conservatorship, CIC could have merged, thereby thwarting the commissioner's ability to satisfy himself regarding CIC's liability under the RPA litigation. Ending the conservatorship without also addressing the commissioner's concerns about the RPA litigation therefore would have failed to remedy the motivation behind it.  CIC asserts that the merger was intended only to avoid collapse of the Berkshire Hathaway deal due to the commissioner's refusal to approve or disapprove the transaction, but its account ignores the substance of why that deal almost collapsed.

### b. Mandated departure

CIC objects that its departure from California cannot justify section 2.6 because its departure is not voluntary but rather mandated by section 2.4 of the plan.[6]  CIC did not object to section 2.4 in the trial court and does not object to it on appeal, so this argument is not well taken.  CIC's claims about a mandated departure also belie the history of this case.  CIC began the process of merging with CIC II and redomesticating to allow the Berkshire Hathaway transaction to close.  The Berkshire Hathaway transaction did close, which was one of the New

---

[6] Section 2.4 of the rehabilitation plan states that on the date the reinsurance and assumption agreement takes effect, the commissioner as conservator "shall effectuate the merger of CIC into and with" CIC II, "thereby completing the attempted redomestication of CIC from California to New Mexico, and upon the effective date of the merger of CIC into and with CIC II and the transfer of the domicile of CIC to New Mexico, CIC shall cease to be a California domestic insurer."

Mexico superintendent's conditions of approval of the merger. CIC II also satisfied the other condition, which was that CIC II file articles of merger with the New Mexico secretary of state. All that remains is the filing of the certificate of merger with the California secretary of state. (Corp. Code, § 1108, subd. (d).) It is thus more accurate to say that sections 2.4 and 2.6 of the rehabilitation plan place conditions on the completion of the departure that is already under way.

Given that CIC began the departure process without the commissioner's approval and it is partly complete, the commissioner is within his rights to place conditions on the completion of the departure. When an insurer follows the normal procedure for withdrawal from the state by filing an application and surrendering its certificate to the commissioner (§ 1070), the "insurer who has commenced the withdrawal process may not unilaterally terminate it and the Commissioner may condition termination of the withdrawal process on appropriate remedial action by the insurer." (*Travelers Indemnity Co. v. Gillespie* (1990) 50 Cal.3d 82, 102 (*Gillespie*).) The commissioner must have the same or greater authority over an insurer who is placed in conservatorship for attempting to extinguish its certificate through a merger and departure without the commissioner's approval. (See § 701 [an insurer's certificate of authority "shall expire with the expiration or termination of a corporate existence of the holder thereof"].)

35

### c. Statutory basis

According to CIC, section 1071.5, which the trial court cited as authority supporting section 2.6, is inapplicable for several reasons, including that the RPA litigation claims are not "liabilities" of CIC within the meaning of section 1071.5 and requiring it to settle litigation as a condition of withdrawing from the state would violate its constitutional rights.

CIC's interpretation of section 1071.5 is dubious, but we need not examine CIC's contentions in detail because the commissioner's authority to fashion the rehabilitation plan does not depend on section 1071.5. Section 1071.5 governs an insurer's withdrawal from the state, so if CIC were simply trying to withdraw then section 1071.5 would govern. But CIC is not like most withdrawing insurers. It is under conservatorship. Section 1037(c), which the trial court cited as supporting section 2.6, allows the commissioner as conservator of an insurer to "compromise or in any other manner negotiate settlements of claims against" the conserved insurer. Sections 1012 and 1043 also empower the commissioner to enter into rehabilitation agreements to end a conservatorship. The commissioner reasonably concluded that settlement of the RPA litigation was necessary to end the condition that gave rise to the conservatorship, as we concluded *ante*, so sections 1012, 1043, and 1037(c) provide sufficient authorization to support section 2.6.

CIC resists application of section 1037(c), arguing that statute gives the commissioner authority to settle cases during

the conservatorship, not as a condition of exiting it. This gets things backwards. As CIC itself notes, *Commercial Nat. Bank v. Superior Court, supra*, 14 Cal.App.4th at page 410 recognized that the commissioner can reasonably exercise the state's police power and has authority under section 1043 to enter into rehabilitation agreements, subject to limitations in the other statutes dealing with conservatorships. If section 1037(c) authorizes settlements, that is no reason to think section 1043 does not. CIC fails to show that the commissioner's section 1043 authority to use settlements to fashion a rehabilitation plan is narrower than his section 1037(c) settlement authority during a conservatorship.

### d. Claims against affiliates

CIC notes that section 1037(c) allows the commissioner as conservator to settle "claims against that person" being conserved. It then argues that the RPA litigation mostly consists of claims against CIC's affiliates, not CIC itself. However, the commissioner's authority in a conservatorship is not limited to the entity being conserved. (*Garamendi v. Executive Life Ins. Co.* (1993) 17 Cal.App.4th 504, 520, 523 (*Garamendi*).) A trial court may assert in rem jurisdiction over assets of entities that have an "identity of interest" with a conserved insurer and include them within the scope of the commissioner's rehabilitation plan for an insurer if it is reasonably necessary to promote the insurer's rehabilitation. (*Ibid.*) *Garamendi* relied in part on the fact that insurance conservatorships are a state law equivalent of bankruptcy and that federal bankruptcy law asserts jurisdiction

37

over entities that are legally separate from the debtor where necessary to the successful administration of a debtor's estate. (*Id.* at pp. 515–517.) But *Garamendi* also emphasized that "the business of insurance is affected with a public interest," "insurance is a public asset," and creditors, policyholders, and the public have an important stake in preserving the business of insurers. (*Id.* at pp. 515–516.)

As the trial court ruled, *Garamendi*'s holding supports section 2.6 of the plan here. While there is no indication that CIC is insolvent, the commissioner's authority springs from the same statutes that allow conservatorships in cases of insolvency and the public has an interest in regulation and legally sound operation of insurers like CIC. CIC is correct that neither the commissioner nor the trial court found that CIC's affiliates were alter egos of CIC, and the relationship between CIC and its affiliates is not exactly the same as the entities at issue in *Garamendi*. But nothing in *Garamendi* conditioned its assertion of in rem jurisdiction on an alter ego finding, and its rationale based on the public interest in insurers also applies here. (*Garamendi*, *supra,* 17 Cal.App.4th at pp. 516–520, 523.)

CIC and its affiliates operated the RPA and EquityComp programs as a joint enterprise, dividing obligations and authority for the express purpose of avoiding regulation by the commissioner, as the commissioner found in *Shasta Linen* and as other courts have concluded. (E.g., *Nielsen Contracting, supra*, 22 Cal.App.5th at pp. 1116–1117 [agreeing with *Shasta Linen* that CIC and its affiliates "were 'so enmeshed' and 'intertwined'

38

that they should be considered together in determining whether the RPA constitutes a modification of the CIC policies"]; *Luxor Cabs, supra*, 30 Cal.App.5th at p. 986 [viewing "EquityComp as a single, integrated insurance program" despite the distinctions between CIC and its affiliates]; *Applied Underwriters, Inc. v. Lara, supra*, 37 F.4th at pp. 592–593 [discussing *Garamendi* with approval].)  As one of these courts noted, "Obviously, allowing an insurer to circumvent the comprehensive regulatory structure applicable to the issuance of workers' compensation insurance in this state simply by amending its approved policy forms through a side agreement with a subsidiary is contrary to the public policy underlying California's workers' compensation law and cannot be countenanced." (*Luxor Cabs*, at p. 986.)  The RPA litigation has reflected this integrated relationship between CIC and its affiliates, since in at least one case, a federal court affirmed an arbitration award requiring a policyholder to pay premiums to CIC, over the policyholder's objection that CIC was not a party to the arbitration.  (*American, Etc., Inc. v. Applied Underwriters Captive Risk Assurance Co.* (N.D. Cal. Dec. 28, 2017, No. 17-cv-03660 DMR) 2017 WL 6622993, at *3–*5.)  In these circumstances, excluding the RPA litigation from the rehabilitation plan because plaintiffs sued one of the other entities involved in the joint EquityComp program besides CIC would thwart the commissioner's authority to remedy the problem that gave rise to the conservatorship.

### e. Most advantageous terms

CIC contends that section 1037(c) only allows settlement of claims "upon such terms and conditions as the commissioner shall deem to be most advantageous to the estate of the person being administered" (§ 1037(c)) and asserts the trial court did not find that section 2.6's three settlement options are to CIC's advantage.

CIC's statement of the standard governing settlements by an insurance conservator is incomplete. While section 1037(c) requires settlements to be most advantageous to the estate, section 1057 declares that when acting as a conservator, "the commissioner shall be deemed to be a trustee for the benefit of all creditors and other persons interested in the estate of the person against whom the proceedings are pending." And as *In re Executive Life Ins. Co.*, *supra*, 32 Cal.App.4th at page 376 explained, the commissioner's actions are also inflected with the public interest, given the character of insurance and that the commissioner "acts not only as a trustee but also as a servant of the state in the exercise of its police power." "Of necessity, if required to satisfy the public interest, the Commissioner possesses considerable discretion in settling claims." (*Id.* at p. 381.) Thus, when deciding whether a settlement of claims against a conserved insurer is "both in the best interest of the conservancy estate and necessary to vindicate the public interest" (*ibid.*), the commissioner must consider not just the insurer itself, but also others interested in the insurer, such as policyholders or creditors, as well as the public interest at stake. Additionally,

even when a settlement of one claim cannot be justified on its own, it may be justified if it is part of a global settlement or contributes to a near global settlement. (*Id.* at p. 382.)

The trial court quoted *In re Executive Life Ins. Co.*'s statement of the standard for settlements, described how section 2.6 offered the possibility of a settlement of the substantial majority of the RPA litigation, described in detail the substantial evidence supporting the commissioner's conclusion that CIC faced significant legal exposure in the litigation, and found section 2.6 had a rational basis in its entirety. The import of the trial court's decision is that the commissioner reasonably concluded the section 2.6 settlement options were most advantageous to the public interest and the estate because of CIC's potential liability.

Regarding CIC's potential liability, the trial court found substantial evidence supported the commissioner's belief that the RPA was void. Section 2.6's first settlement option reflects this possibility, since it would allow policyholders to settle by paying only what they owe under the guaranteed cost policy. The trial court recognized that policyholders could also enforce the RPA, despite its illegality, to prevent unjust enrichment to CIC. Section 2.6's third settlement option represents this possibility, since it would allow policyholders to enforce the guaranteed cost policies and the RPA in full, which might result in a payment to CIC.

The trial court found that CIC could also be liable under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq. (UCL)) for engaging in unlawful acts based on the failure to file

41

the RPA for approval, unfair acts by using an unfiled insurance policy that was not disclosed until after the policyholders were already bound, and fraudulent practices by misrepresenting the EquityComp plan in marketing materials. The trial court found section 2.6's second settlement option — which would allow policyholders to obtain restitution of any amounts they paid over the cost of a standard, approved retrospective rating plan — to be a reasonable approach to calculating quantum meruit restitution, which would be a remedy for UCL violations.

CIC does not mention, let alone dispute, any of the trial court's conclusions regarding its potential liability under these theories. Instead, it contends that a global settlement is not to CIC's advantage and violates its due process rights because CIC defeated all attempts to certify classes of policyholders, the settlement would prevent CIC from challenging each plaintiff's evidence, and it would require CIC to forfeit potentially meritorious individual defenses, including showing that a plaintiff had suffered no damages. CIC also points out that its *Shasta Linen* settlement with the department acknowledged that the legality of the RPA was "for the courts to decide" and asserts that it prevailed in RPA litigation on numerous grounds.

We find no abuse of discretion in the trial court's and commissioner's conclusions that CIC faces significant enough liability under the RPA litigation that it is most advantageous to CIC, policyholders, creditors, and the public for the commissioner to offer to settle on the terms in section 2.6. (See *In re Executive Life Ins. Co.*, *supra*, 32 Cal.App.4th at p. 358 [courts must affirm

42

rehabilitation plan if it is not arbitrary, discriminatory, contrary to a specific statute, or a breach of the conservator's fiduciary duty as trustee].)

The *Shasta Linen* settlement's statement about the courts deciding the legality of the RPA is of no consequence, since it predated CIC's attempted unauthorized merger to evade the commissioner's consideration of the RPA litigation and the resulting conservatorship. The settlement also reserved the commissioner's right to "initiate any legal or administrative proceeding, to take any action permitted by law and to seek and obtain all relief and remedies available (including any fine or penalties) or to adjudicate the right of others, as otherwise permitted by law." Nothing in the settlement precludes section 2.6.

The trial court considered CIC's claim of substantial success in the RPA litigation and reasonably found it unpersuasive. CIC did prevail in defeating class certification motions, but those rulings have no bearing on the merits of any individual policyholder's claims. The fact that the RPA litigants were unable to satisfy the procedural requirements for class action due to individualized issues, as CIC asserts, is irrelevant to deciding whether the global settlement and the application of the three settlement options is in CIC's interest. Section 2.6 does not vitiate CIC's class certification victories in any event. The policyholders eligible to settle under section 2.6 are those who already filed claims, those whom CIC identifies as potentially owing CIC payments, and ten policyholders who had already

43

submitted claims to the conservator. CIC does not contend that these categories encompass the same number of policyholders that a class action would have.

Apart from class certification motions, the victories CIC cites primarily concern enforcement of arbitrability delegation or forum selection clauses in courts in other states or piecemeal dismissals of individual causes of action. These limited successes do not show that CIC has a strong likelihood of ultimately defeating policyholders' suits as a whole. The record as a whole contains substantial evidence that policyholders prevailed more often in showing the RPA, or portions of it, to be void and unenforceable, especially after the issuance of the Court of Appeal decisions beginning with *Nielsen Contracting*, *supra*, 22 Cal.App.5th 1096. CIC points out that the Court of Appeal decisions the trial court cited concern the enforceability of the arbitration agreement within the RPA, rather than the RPA itself. (E.g., *id.* at p. 1121, fn. 6 [decision was limited to factual record on the hearing on motion to compel and did not preclude parties from litigating merits of plaintiff's causes of action regarding the RPA].) This argument ignores that the same grounds for invalidating an arbitration agreement within a contract can provide a stronger basis for invalidating the entire contract. (*Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63, 71 ["In some cases the claimed basis of invalidity for the contract as a whole will be much easier to establish than the same basis as applied only to the severable agreement to

44

arbitrate"].) Moreover, other decisions the commissioner cited declared the entire RPA invalid.

CIC notes that some decisions have found a policyholder liable for unpaid premiums regardless of the RPA's illegality. (E.g., *Applied Underwriting, Inc. v. Top's Personnel, Inc.* (D. Neb. Aug. 2, 2018, No. 8:15-CV-90) 2018 WL 3675242, at *3–*4.) Again, there are decisions going the other direction. Additionally, litigation of many of the cases was stayed because of the initiation of the conservatorship. Given that the EquityComp system was structured as a combination of the guaranteed cost policies and the RPA and that the commissioner supplied an actuary's opinion that CIC's guaranteed cost premiums were roughly 33 percent higher than market rates, the trial court could reasonably conclude that courts or arbitrators in the future (including appellate courts, in cases where CIC had prevailed or would likely prevail in a lower court) would find it unfair and inequitable to enforce just the guaranteed cost plan rates after finding the RPA to be illegal.[7]

---

[7] CIC disputes the 33 percent figure, claiming the actuary only said in his deposition that the 33 percent figure was his "impression" and relied on no data. CIC also notes that it provided an actuarial expert's analysis that found CIC's rates were in the middle of the market. But the department's actuary explained elsewhere that CIC's rates were based on the loss trends of its policy portfolio and those loss trends were higher than the loss trends for the industry as a whole. The department also noted in its reply that CIC's actuarial analysis was based on filed rates, not the rates CIC actually charged, and did not reflect that CIC's rates were higher than the industry-wide average despite CIC not insuring policyholders with the highest losses.

In short, the evidence from CIC and the commissioner demonstrates at best that CIC has had limited success in the RPA litigation. This is not sufficient to show an abuse of discretion by the trial court or commissioner in finding section 2.6's settlement options to be most advantageous to CIC's estate and interested third parties. Considering California's strong public policy favoring the settlement of disputes (*Rheinhart v. Nissan North America, Inc.* (2023) 92 Cal.App.5th 1016, 1027) and the costs of litigation, the trial court could reasonably determine that settlement was beneficial to CIC here, especially because it would expedite the end of the conservatorship. Additionally, settlement of a claim that may not be justified on its own can be justified as part of a global or near-global settlement. (*In re Executive Life Ins. Co.*, *supra*, 32 Cal.App.4th at p. 382.) Even if CIC might have defeated some of the RPA cases on the merits based on individualized defenses or had a net recovery after some plaintiffs' damages were offset against premiums still owing to CIC or its affiliates, the trial court and commissioner reasonably decided that it was most advantageous to achieve a near-global settlement, with the resulting litigation cost savings, by offering the three settlement options in section 2.6.

---

The department's analysis constitutes substantial evidence, so the trial court was entitled to decide which of these competing analyses it found most persuasive.

### f. More favorable settlement

CIC challenges option 2 specifically as offering RPA plaintiffs a more favorable outcome than they could have obtained through litigation because it calculates the fair market value of the benefits under the EquityComp plan by using a general retrospective rating plan rather than one that CIC offered. Option 2 represents the commissioner's attempt to use a generic retrospective policy approved by the commissioner to calculate the fair market value of the coverage a policyholder received from CIC, which CIC would be entitled to retain under the UCL even if a plaintiff prevailed. As the trial court noted, fair market value is commonly defined as that amount "that 'hypothetical buyers and sellers' would pay in a 'hypothetical transaction.' " (*Long Beach Memorial Medical Center v. Kaiser Foundation Health Plan, Inc.* (2021) 71 Cal.App.5th 323, 343, 345 [discussing measure of damages under quantum meruit claim, which was identical to restitution under UCL]; see also *id.* at p. 346 [defining fair market value based on hypothetical transactions "is affirmatively helpful because it emphasizes another pertinent legal principle — namely, that the parties' prior actual transactions are not dipositive"].) Option 2 therefore represents a reasonable approximation of a remedy that RPA plaintiffs might obtain through litigation, but it avoids the costs of litigation CIC would otherwise incur.

### 2. Reinsurance of CIC's policies under section 2.2

Besides section 2.6's settlement options for the RPA litigation, CIC also challenges the trial court's approval of section

2.2 of the plan, which requires CIC to enter into a reinsurance and assumption agreement for its California policies. "A reinsurance contract is 'one by which an insurer procures a third person to insure him [i.e., the insurer] against loss or liability by reason of such original insurance.' (§ 620.) If the agreement is purely for reinsurance, it benefits only the insurer; the original insured has no interest in it (§ 623) and acquires no rights under it. [Citation.] Such an agreement clearly cannot operate to relieve the original insurer of any obligation to the insured. [¶] A contract by which a reinsurer assumes the policies of the original insurer does result in the reinsurer being directly liable to the original insureds [citation], but it does not release the original insurer, which remains jointly obligated with the reinsurer [citations.]." (*Gillespie*, *supra*, 50 Cal.3d at pp. 95–96, italics omitted.)

CIC's first argument is that section 2.2 improperly requires the sale of over 85 percent of its business to end the conservatorship, which is tantamount to liquidation. CIC points out that liquidation is supposed to be the last resort in a conservatorship. (*Carpenter*, *supra*, 10 Cal.2d at p. 329.) But liquidation entails distributing an insurer's assets to creditors, and it is a last resort because it dissolves the company and deprives policyholders of insurance protection. (*Ibid.*) CIC, by contrast, will retain any proceeds from the reinsurance and assumption agreement, rather than distributing them to its creditors, so section 2.2 is not a liquidation. Section 2.2 also does

not deprive any policyholders of insurance protection, so it need not be a last resort like liquidation.

Although CIC briefly suggests otherwise, reinsurance is within the commissioner's express authority as conservator. Section 1043 states that "the commissioner, as conservator or as liquidator, may, subject to the approval of said court, and subject to such liens as may be necessary mutualize or reinsure the business of such person, or enter into rehabilitation agreements." There can be no question that the commissioner has the necessary authority.

CIC claims that the commissioner could have pursued less onerous alternatives, including allowing CIC to continue to service its policies after leaving the state. As noted *ante*, CIC's attempted merger with CIC II would have led to it departing from California, functionally equivalent to a withdrawal from the state. Before withdrawing from the state, an insurer must "discharge its liabilities to residents of this State," including causing its policies "to be reinsured and assumed by another admitted insurer." (§ 1071.5.) The commissioner will then cancel the withdrawing insurer's certificates of authority and allow the insurer to withdraw. (§ 1072.) Section 1072 gives the commissioner discretion to waive this requirement if he finds the withdrawing insurer to be solvent. (*Ibid.*)

The default assumption of sections 1071.5 and 1072 is that a withdrawing insurer will have its remaining policies reinsured and assumed by an admitted insurer. The commissioner reasonably decided to the take the same approach with CIC given

49

that its merger was functionally a withdrawal from the state. CIC protests that *Gillespie, supra*, 50 Cal.3d at page 99 held that an insurer that withdraws can still service its policies from out of state, as demonstrated by the fact that section 1072 allows the commissioner to waive the reinsurance and assumption requirement for a solvent insurer. This is true, but the commissioner still retains the discretion over whether to waive the reinsurance and assumption requirement. (§ 1072 ["The commissioner may, in his discretion, waive any or all of the above requirements . . ."].) The trial court did not abuse its discretion in not requiring the commissioner to waive the presumptive requirement of reinsurance and assumption here, where CIC attempted to merge and depart from California without the commissioner's consent and with the purpose of evading the commissioner's review of its handling of the RPA litigation.[8] (*Applied Underwriters, Inc. v. Lara, supra*, 37 F.4th at p. 597 [CIC merger "was an obvious attempt to avoid the California insurance regulatory regime"].)

In its second challenge to section 2.2, CIC argues the trial court abused its discretion by approving the specific provision that requires that any reinsurer who is affiliated with CIC, such as Continental, to use a third-party claims administrator. CIC

---

[8] The trial court also found the reinsurance and assumption requirement justified based on evidence that CIC's management had repeatedly evaded the commissioner's regulatory authority, both before and during the conservatorship. Much, if not all, of the evidence of this evasion provides further support for the trial court's order, but it is not necessary to consider it because CIC's conduct giving rise to the conservatorship is sufficient on its own.

argues that the department proposed the third-party administrator condition for a CIC-affiliated reinsurer without evidence to support it and then tried and failed to justify it retroactively.

The trial court found the commissioner reasonably insisted on a third-party claims administrator if Continental or another CIC affiliate reinsured and assumed CIC's policies, based in part on the fact that Continental is operated by the same management as CIC, including Menzies as the president and chief executive officer. The trial court also found substantial evidence showed that CIC had not treated policyholders fairly by (1) increasing payouts on claims or inflating the reserves necessary for claims, thereby triggering higher costs for policyholders; and (2) keeping claims open to postpone having to return unused premiums to the policyholders, so that CIC could maximize the investment returns it made on the funds.

We find substantial evidentiary support for all three points. First, the record shows that Menzies is Continental's president and chief executive officer and Jeffrey Silver is its Secretary. Menzies and Silver hold similar roles in CIC as well as AUCRA, which is another of the entities involved in the RPA and the EquityComp program. Given the identical management, allowing Continental to reinsure and assume CIC's policies and continue servicing claims would defeat the reinsurance and assumption agreement's purpose of protecting policyholders from management that has demonstrated its willingness to attempt to evade the commissioner's oversight. It would essentially change

the nameplate on the door but allow the business to continue to operate as usual. This alone is sufficient to support the third-party administrator requirement.

Second, the commissioner submitted evidence showing that the EquityComp program incentivized CIC to increase payments or reserves for claims unnecessarily and that CIC in fact did so. Regarding the incentive, most retrospective rating plans increase the premiums a policyholder pays linearly as losses increase, up to a maximum premium. But the EquityComp plan increased premiums steeply for the initial portion of losses to a certain amount, then raised premiums more slowly if losses continued to increase. If CIC overpaid claims and thereby increased its losses, or if it set an artificially high estimate of reserves necessary to pay losses on a claim in the future, it could trigger the initial steep increase in premiums that policyholders would have to pay. Counsel for plaintiffs in many of the RPA cases, Larry J. Lichtenegger, submitted a declaration detailing specific instances in which CIC's overpayment of employee claims increased policyholders' costs, including one in which a putatively injured former employee was working for a competitor, and CIC verified the fraud but continued paying the former employee. The commissioner also cited the *Shasta Linen* case, which relayed a policyholder's account of CIC's failure to investigate potential fraud on a claim that cost the policyholder over $100,000. (*Shasta Linen*, *supra*, at p. 38.)

Finally, the commissioner provided evidence that CIC kept claims open to retain policyholders' funds longer, to maximize

52

CIC's profits. The EquityComp program was structured to allow AUCRA (the CIC-affiliated reinsurer that took risk and premiums from CIC and passed them back to the policyholders) to require policyholders to post collateral to secure their payment of additional premiums due to losses. Setting high collateral amounts for future losses benefited CIC and its affiliates because CIC could earn investment returns on the collateral and did not have to share the returns with the policyholders. CIC followed these incentives in several cases documented in Lichtenegger's declaration. For example, CIC refused to accept an employee's offer to settle a claim for less than the amount of reserves set aside for the claim, even though the policyholder, which would incur the cost for the settlement, wanted to pay it in order to have CIC refund the excess reserves.

In response to this evidence, CIC cites evidence that the department allowed CIC to continue to handle claims during the conservatorship and CIC was rated highly in claims handling in state audits. CIC also attacks Lichtenegger's credibility, asserting, among other things, that he and his clients were obviously self-interested and arguing that he cited very few specific examples of claims handling. Finally, CIC argues, primarily in a footnote, that it submitted a declaration by an expert who reviewed CIC's files for the policyholders mentioned and refuted Lichtenegger's allegations.

The trial court reasonably rejected or discounted CIC's arguments. The commissioner could reasonably conclude that his oversight and that of his representatives, including being

physically present at CIC's offices in Nebraska, were sufficient to deter CIC from its prior abusive practices. CIC's high marks in audits of its claims handling do not undercut the commissioner's evidence of overpayments. As the trial court noted, the audits looked for evidence of underpayments, not overpayments, so CIC's high scores do not refute the evidence that CIC was overpaying claims to collect higher premiums from its policyholders. And Lichtenegger's declaration did not purport to provide an exhaustive description of all of his clients' qualms about CIC's claims handling, so the quantity of examples he cited is not disqualifying. Although Lichtenegger's credibility was legitimately open to question for various reasons (including his position as advocate for policyholders with RPA litigation claims against CIC), credibility decisions were for the trial court and the commissioner to make. The court and commissioner could reasonably decide to rely on Lichtenegger, given his unique familiarity with the experiences of many different policyholders. Although CIC's expert declaration provided the trial court an alternative view of the evidence, the trial court was ultimately faced with conflicting evidence on both sides, and CIC's evidence relating to its claims handling was not so overwhelming as to undercut the value of the commissioner's evidence as a matter of law.

In sum, we are unpersuaded that the trial court abused its discretion by approving section 2.2.

## DISPOSITION

The trial court's order is affirmed.

54

BROWN, P. J.

WE CONCUR:

STREETER, J.
SIGGINS, J.*


*Lara v. California Insurance Company*  (A170622)

---

* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 7/23/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| RICARDO LARA, as Insurance Commissioner, etc.,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CALIFORNIA INSURANCE COMPANY,<br><br>    Defendant and Appellant. | A170622<br><br><br>(San Mateo County Super. Ct. No. 19-CIV-06531)<br>ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

The requests for publication of this court's June 27, 2025 opinion are granted, and it is hereby ordered that said opinion be published in the Official Reports.

Dated: _____
                          BROWN, P.J.

1

Trial Court: San Mateo County

Trial Judge: Hon. Susan L. Greenberg

Counsel for Appellants: Boies Schiller Flexner LLP
Samuel C. Kaplan
Amy L. Neuhardt
Benjamin P. Solomon-Schwartz
Maxwell V. Pritt
Reed D. Forbush
David A. Barrett

Counsel for Respondents: Strumwasser & Woocher LLP
Michael J. Strumwasser
Dale K. Larson
Julia Michel

Orrick, Herrington & Sutcliffe LLP
Cynthia J. Larsen
Justin Giovannettone

*Lara v. California Insurance Company* (A170622)